**AERON MARINE SHIPPING CO., et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants,**

and

**American Maritime Association, Defendant-Intervenor.**

Civ. A. No. 79–2048.

United States District Court, District of Columbia.

Oct. 21, 1981.

Michael Joseph, Thomas L. Mills, Mark P. Schlefer, Washington, D. C., for plaintiffs.

John O. Birch, Asst. U. S. Atty., Washington, D. C., for defendants.

Joseph Klausner, Allan A. Tuttle, Donald Lofty, Patton, Boggs & Blow, Washington, D. C., for defendant-intervenor.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

This case presents an issue involving the interaction of certain provisions of the Merchant Marine Act of 1936 (the Act),[1] its 1970 Amendments,[2] and various Acts which provide preferences for American-flag ships for the carriage of certain cargo.[3] Before detailing the procedural posture of the instant litigation, it appears necessary to discuss the major congressional objective of the 1970 Amendments to the Act. To build a strong merchant marine, Congress in 1936 provided for operating differential subsidies (ODS)[4] for United States-flag, liner vessels. While most foreign trade in 1936 was of a break bulk variety transportable in liner vessels, most foreign trade in 1970 was carried by foreign-flag bulk carriers.[5] The

---

1. Ch. 858, 49 Stat. 1985 (current version codified at 46 U.S.C. §§ 1101–1294 (1976)).

2. Pub. L. No. 91–469, 84 Stat. 1018 (1970).

3. The primary cargo preference law is the Cargo Preference Act of 1954, ch. 936, 68 Stat. 832 (codified at 46 U.S.C. § 1241 (1976)), which provides in pertinent part:

   (b)(1) Whenever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any equipment, materials or commodities, within or without the United States, or shall advance funds or credits or guarantee the convertibility of foreign currencies in connection with the furnishing of such equipment, materials, or commodities, the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such equipment, materials, or commodities (computed separately for dry bulk carriers, dry cargo liners, and tankers), which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas ...

   There are two other cargo preference provisions. *See* Act of March 26, 1934, ch. 90, 48 Stat. 500 (codified at 46 U.S.C. § 1241–1 (1976)) (products whose export is fostered by United States' loans should be carried exclusively in United States' vessels); Act of April 28, 1904, ch. 1766, 33 Stat. 518 (codified at 10 U.S.C. § 2631 (1976)) (only United States' vessels carry supplies of armed forces).

4. Primarily because of lower labor costs, foreign-flag ships were able to operate more cheaply than American vessels. Hence, the ODS was designed to subsidize American vessels so that they would not be at a competitive disadvantage against foreign vessels. *See generally* 46 U.S.C. §§ 1101, 1171–76, 1178–83 (1976). The Secretary of Commerce is charged by the Act with the responsibility for the implementation of the ODS program. The Undersecretary of Commerce has been delegated the authority in reviewing actions taken by the Maritime Subsidy Board (MSB), the body that actually administers the ODS program.

5. *See* H.R.Rep. No. 91–1073, 91st Cong., 2d Sess. 38 (1970). Bulk cargo vessels carry liquid or dry bulk cargoes worldwide, but do not provide scheduled service over specified trade routes.

few existing American bulk carriers were engaged almost exclusively in the carriage of preference cargoes at premium freight rates paid by the government as an indirect subsidy to offset higher United States-flag operating costs. To encourage the operation of American bulk carriers in foreign commercial trade, Congress in the 1970 Amendments extended the ODS to bulk carriers.[6]

One of the issues left unresolved by Congress in the 1970 Amendments was whether subsidized carriers[7] could carry preference cargoes.[8] In June 1972, the Maritime Subsidy Board (MSB) concluded that subsidized carriers could participate in the preference trades under certain conditions.[9] Both the D.C. and Ninth Circuits subsequently upheld the MSB's order, which removed a significant barrier to the entry of subsidized carriers in the preference trades.[10] Nevertheless, other legal requirements had to be satisfied before the MSB would permit a subsidized carrier to enter the preference trades.

On April 18, 1978, Aeron Marine Shipping Co. (Aeron) and five other subsidized bulk contractors[11] filed applications with the MSB in which they sought to remove restrictions in their existing ODS agreements barring the carriage of dry bulk preference cargo reserved for United States-flag carriers.[12] After the timely submission of comments by various organizations including the American Maritime Association (AMA), the MSB held an expedited one-day hearing, pursuant to the stipulation of all parties,[13] under § 605(c) of the Act.[14] On September 8, 1978, the MSB found, *inter alia*, that § 605(c) was no bar to the carriers' applications because United States-flag service in the bulk preference trades was and would continue to be inadequate and the operation of the applicants' seven vessels

---

**6.** *See* S.Rep. No. 91–1080, 91st Cong., 2d Sess. 34, U.S.Code Cong. & Admin.News 1970, p. 4188 (1970).

**7.** "Subsidized carriers" will be used throughout this opinion to signify those carriers receiving the direct subsidies of ODS. Although technically a misnomer, "unsubsidized carriers" are those who receive the indirect subsidy of premium freight rates for their carriage of preference cargo.

**8.** *See* 1970 Amendments, § 40(a), Pub.L. No. 91–469, 84 Stat. 1018 (permission for bulk carriers to receive ODS has no affect on pending proceedings before Secretary of Commerce concerning payment of ODS for bulk carriers in the preference trades).

**9.** *See* Final Opinion and Order in Docket No. S–244, 13 Shipping Reg. Rep. (P&F) 34 (1972).

**10.** *See States Marine Int'l v. Peterson*, 518 F.2d 1070, 1078 (D.C.Cir.1975), *cert. denied*, 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976); *Columbia Steamship Co., Inc. v. American Mail Line, Ltd.*, 510 F.2d 29 (9th Cir. 1975), *cert. denied*, 424 U.S. 969, 96 S.Ct. 1467, 47 L.Ed.2d 736 (1976).

**11.** The other bulk contractors are American Shipping, Inc., Aquarius Marine Co., Atlas Marine Co., Pacific Shipping, Inc., and Worth Oil Transport Co. which operate five vessels. Aeron operates the Golden Dolphin and Golden Endeavor, Aquarius operates the Golden Monarch, American operates the Beaver State, At-las operates the American Heritage, Pacific operates the Rose City, and Worth operates the Worth.

**12.** *See* 43 Fed. Reg. 19,429 (1978).

**13.** *See* Defendant's Exhibit No. 1, Tentative Opinion and Order in Docket No. A–132, at 2. While this opinion for convenience will cite to Defendant's Exhibits, the Tentative Opinion and Order are reprinted in a looseleaf service for maritime law. *See Aeron Marine Co.*, 19 Shipping Reg. Rep. (P&F) 111 (1979).

**14.** Section 605(c) (codified at 46 U.S.C. § 1175(c) (1976)) provides in pertinent part:

No contract shall be made under this subchapter with respect to a vessel to be operated in an essential service served by citizens of the United States which would be in addition to the existing service, or services, unless the Secretary of Commerce shall determine after proper hearing of all parties that the service already provided by vessels of United States registry is inadequate, and that in the accomplishment of the purposes and policy of this chapter additional vessels should be operated thereon; ...

The Secretary of Commerce has interpreted this provision to cover significant changes in existing ODS contracts. *See Sea-Land Service, Inc. v. Kreps*, 566 F.2d 763, 767 (D.C.Cir.1977). This interpretation is not challenged in the present litigation.

would further the accomplishment of the purposes and policy of the Act.[15]

Despite clearance of the 605(c) barriers, the applicants still had to satisfy other statutory requirements [16] which were reserved by the MSB in its 605(c) opinion for later consideration.[17] After an initial consideration of these non-605(c) issues, the MSB on March 16, 1979, issued a tentative opinion and order in which it denied all of the applications except those of the two vessels operated by Aeron.[18] In addition, the MSB granted Aeron's application on the condition that Aeron would charge world rates for the carriage of preference cargoes.[19] The MSB then invited comments on the tentative opinion and, following consideration of the comments, issued a final opinion on June 15, 1979, which adopted all the material findings of the tentative opinion.[20] Aeron and the five unsuccessful applicants filed suit on August 3, 1979, against the United States, challenging the MSB's authority to exclude five ships from the preference trades and to impose conditions on the rates that the two Aeron vessels could set for the carriage of preference cargoes.

The case is now before the Court on cross-motions for summary judgment. After plaintiffs' cross-motion was filed, AMA, an active participant in all phases of the administrative proceeding underlying the MSB decision, was permitted to intervene in this litigation. AMA then filed a memorandum in support of defendants' motion for summary judgment and in opposition to plaintiffs' cross-motion for summary judgment.

## DISCUSSION

### I. Standard of Review Under the Administrative Procedure Act

■ A reviewing court under the APA must set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A) (1976), or contrary to constitutional, statutory, or procedural mandates. See 5 U.S.C. § 706(2)(B), (C), (D) (1976). In two other narrowly defined instances, agency action must be set aside if the court finds that the action was not supported by "substantial evidence," 5 U.S.C. § 706(2)(E) (1976), or, if, after a trial de novo, the court concludes the action was "unwarranted by the facts." 5 U.S.C. § 706(2)(F) (1976). The substantial evidence standard applies only to cases where agency action is predicated upon a public adjudicatory hearing (5 U.S.C. §§ 556, 557 (1976)), or where agency action is taken after a rulemaking hearing required by statute (5 U.S.C. § 553 (1976)). See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). Neither circumstance applies here. While § 605(c) provides for a "proper hearing," this provision has been interpreted not to require a public, trial-type hearing. See Sea-Land Service v. Connor, 418 F.2d 1142, 1148 (D.C.Cir.1969). See generally United States v. Fla. E. Coast Ry. Co., 410 U.S. 224, 234, 93 S.Ct. 810, 815, 35 L.Ed.2d 223 (1973). As a result, no public adjudicatory hearing was held in the instant case. The Act likewise does not require a rulemaking hearing and such a hearing was not held. Hence, the substantial evidence standard is clearly inapplicable to the instant case.

■ Generally, the proper standard of review in a direct appeal of a MSB decision on an ODS determination is the "arbitrary, capricious, [or] abuse of discretion" standard. See Sea-Land Service, Inc. v. Kreps, 566 F.2d 763, 772 (D.C.Cir.1977). The plaintiffs contend, however, that the MSB's deci-

---

**15.** See Atlas Marine Co., 18 Shipping Reg. Rep. (P&F) 987 (1978).

**16.** For a comprehensive listing of the steps necessary before an ODS will be approved, see American President Lines, Ltd., 2 Shipping Reg.Rep. (P&F) 633, 649–52 (1963).

**17.** See Defendant's Exhibit No. 1, supra at 3–4.

**18.** Id. at 43.

**19.** Id. at 47–48.

**20.** See Defendant's Exhibit No. 2, Final Opinion and Order in Docket No. A–132, reprinted in 19 Shipping Reg.Rep. (P&F) 491 (1979).

sion is subject to *de novo* review. *De novo* review is authorized only "when the action is adjudicatory in nature and the agency fact-finding procedures are inadequate ... [or] when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. Because plaintiffs' suit is not designed to enforce agency action, the latter situation is inapplicable to this case. Thus, plaintiffs' contention hinges on meeting the dual requirements that the MSB proceedings were adjudicatory and that the MSB's fact-finding was inadequate.

■ Plaintiff's argument fails first because the MSB proceedings cannot be characterized as "adjudicatory in nature." The MSB has argued persuasively that when it considers ODS applications, it engages in a legislative function:

> This granting of public funds [for ODS] in an effort to realize a public purpose is clearly a legislative function. We are not determining "rights" or "interests" between parties like the courts would do. We are deciding whether to grant public moneys to private interests to accomplish a public purpose.... We have to look at our national purpose and goals as set out in the statute, and we have to decide not the rights between competing lines ... but rather between the national interest and the individual interest of various U.S. citizens as Congress would do if it had the time.

*American President Lines, Ltd.*, 2 Shipping Reg. Rep. (P&F) 633, 646, 649 (1963). While it is true that the MSB in its ODS proceedings may consider some adjudicative

facts,[21] the predominant consideration in these proceedings is whether granting the ODS fulfills the purposes and policy of the Act. Therefore, the MSB proceedings in the instant case should not be considered "adjudicatory in nature."

■ Assuming, *arguendo*, that the MSB proceedings are "adjudicatory in nature," plaintiffs fail to demonstrate that the MSB's fact-finding was inadequate. Plaintiffs contend that the MSB engaged in inadequate fact-finding in determining that Aeron's vessels must carry preference cargoes at world rates. Where no "hearing" of any type is required by statute,[22] procedural fairness demands that plaintiffs be informed of the MSB's position on the world rate issue and have an opportunity to respond to MSB's contentions before the issuance of a final determination on the issue. *See Moore-McCormack Lines, Inc. v. United States*, 413 F.2d 568, 584–85 (Ct.Cl.1969). These procedural prerequisites were satisfied in the instant case. After the MSB issued its tentative opinion in which it fully discussed its reasoning for requiring world rates, *see* Defendant's Exhibit No. 1, *supra* at 19–22, the MSB afforded all of the interested parties an opportunity, which the plaintiffs exercised, to comment on the tentative opinion. As the MSB's final opinion indicates, *see* Defendant's Exhibit No. 2, *supra* at 10–12, the MSB fully considered plaintiffs' arguments in reaching its final determination. Moreover, the conclusion that the MSB engaged in adequate fact-finding is enforced by the plaintiffs' concession that "the fundamental arguments contained in the[ir] affidavits [23] were presented

---

**21.** The distinction between legislative and adjudicative facts has been summarized as:

> Adjudicative facts are the facts about the parties and their activities, businesses, and properties.... adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion.

1 K. Davis, Administrative Law Treatise § 7.02, at 413 (1958).

**22.** In contrast to § 605(c), none of the statutory provisions of the Act under which defendant claims the MSB had authority to condition the receipt of the ODS on the setting of world rates, *see* §§ 601(a), 603(a) (codified at 46 U.S.C. §§ 1171(a), 1173(a) (1976)), requires a hearing.

**23.** Whether this Court should consider these affidavits, in determining if the world rates required by the MSB are unreasonable, will be postponed until after this Court determines if the MSB had authority to condition the receipt

to the Board and fully considered in its Final Decision." Hence, even the extra record materials submitted by the plaintiffs raise no arguments that the MSB had not fully considered. Thus, *de novo* review is not justified because the MSB was under no procedural obligation to engage in additional fact-finding and because the MSB fully considered all the arguments made by plaintiffs, who had adequate opportunity to make those arguments.[24]

■ In applying the arbitrary and capricious standard, a reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. A court must even affirm a decision with which it disagrees, as long as the agency has considered the relevant factors and a rational basis exists for its decision. *See id.* at 416, 91 S.Ct. at 823. While

a court must be satisfied "that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent," *Ethyl Corp. v. EPA*, 541 F.2d 1, 34–37 (D.C.Cir.) (*en banc*), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), a court should not second-guess the agency's expertise in the exercise of its specialized, experienced judgment. *Id.*

■ The only remaining issue which affects the scope of review is what deference should be given to the legal judgments of the MSB such as its ability to exclude subsidized carriers from the preference trades and its authority to condition receipt of ODS on the setting of world rates. In a case involving a MSB decision under § 605(c), the Court of Appeals for the District of Columbia Circuit concluded that a district court should "defer to a reasonable

---

of the ODS on the setting of world rates. *See* pages 541–545 *infra.*

**24.** Although plaintiffs raise no other rationale for *de novo* review, one other argument becomes available to plaintiffs as a result of this Court's interpretation of § 605(c) of the Act. The MSB has defended its exclusion of five of plaintiffs' vessels from the preference trades on the ground that it fulfills one of the legislative concerns of the 1970 Amendments which was to protect unsubsidized carriers. *See* Defendant's Exhibit No. 1, *supra* at 23, 40. For reasons explained elsewhere, *see* page 538 *infra*, this determination was a § 605(c) issue and the MSB should have decided it in its 605(c) opinion, rather than reserving it for later determination.

Despite this procedural irregularity, plaintiffs could not contend successfully that "inadequate fact-finding" resulted. First, the determination of the extent of Congress' desire to protect unsubsidized carriers is a legal issue for which fact-finding is inapplicable. Second, when the MSB actually decided the issue has no bearing on the adequacy of fact-finding. In fact, the MSB's reservation of the issue enabled plaintiffs to have greater input, through the submission of written comments. Third, the MSB was under no procedural obligation to engage in additional proceedings (which could be construed as "fact-finding"). The statutory requirement of a "hearing" does not force an administrative agency to hear oral testimony, to permit cross-examination, or to hear oral argument. *See United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 241, 93 S.Ct. 810, 819, 35 L.Ed.2d 223 (1973). In interpreting another

statutory provision that the Federal Maritime Commission administers which also requires a "hearing," the Commission has been instructed to "conduct whatever proceedings are necessary to secure sufficient information so that its final decision will reflect a consideration of the relevant factors." *Seatrain Int'l, S. A. v. FMC*, 584 F.2d 546, 550 (D.C.Cir.1978). Imposing additional procedural requirements would unduly limit the discretion an administrative agency "must have in order to mold its procedures to the exigencies of the particular case." *United States v. FMC*, No. 79–1299, slip op. at 55 n.68 (D.C.Cir. December 19, 1980). Because of the wide latitude given the Commission to develop a "hearing" record, plaintiffs' opportunity to comment on the MSB's tentative opinion through written submission satisfied any procedural requirements. Fourth, even if a § 605(c) hearing usually has certain procedural requirements, plaintiffs and defendants in the present case stipulated that an abbreviated, one-day hearing procedure would fulfill the hearing requirements of the Act. *See Atlas Marine Co.*, 18 Shipping Reg. Rep. (P&F) 987, 992 (1978). Finally, giving the MSB flexibility in structuring its proceedings is consistent with congressional intent. When it passed the 1970 Amendments, Congress expressed its fear that the goal of increasing commercial bulk carrier capacity could be frustrated by protracted § 605(c) hearings and encouraged that such hearings should be expedited or eliminated entirely. *See* H.R.Rep. No. 91–1073, 91st Cong., 2d Sess. 42 (1970).

interpretation by the agency of a statute which it is charged with administering."[25] *Sea-Land Service, Inc. v. Kreps,* 566 F.2d 763, 772 n.45 (D.C.Cir.1977). Yet, less deference should be accorded where, as in the instant case, the resolution of legal issues depends largely on an analysis of legislative history for which "the courts are the specialists," *Id.* at 780–81 n.15 (Robinson, C. J., dissenting), *quoting* K. Davis, Administrative Law Treatise § 30.09, at 243 (1958). Moreover, the MSB's statutory interpretations, which supported exclusion of five of plaintiffs' vessels and the imposition of the world rate condition, were not adopted contemporaneously with enactment of § 605(c), are not longstanding constructions, and have not been implicitly relied upon by Congress. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). Hence, giving deference to the MSB's statutory interpretations does not force this Court to adopt agency constructions contrary to congressional intent.

## II. *The Denial of Five Vessels from Participation in the Preference Trades*

Plaintiffs initially claim that the MSB had no authority to exclude five of their subsidized vessels from carrying preference cargoes. Two questions must be considered in analyzing this claim. First, did the MSB in its 605(c) opinion determine a two or seven ship deficit in United States-flag bulk vessel capacity in the preference trades? Second, if the MSB did find a seven ship deficit, did it have the power to exclude five of those seven ships from the preference trades in order to protect existing unsubsidized carriers?

**25.** Another court has reasoned that while the MSB has discretion to determine the fairness and reasonableness of ODS, the MSB's decisions on legal issues "are for the court to decide independently of the board's conclusions thereon which have no finality." *American Export Isbrandtsen Lines, Inc. v. United States,* 499 F.2d 552, 580 (Ct.Cl.1974).

## A. *The MSB's § 605(c) Inadequacy Determination*

Before an ODS may be awarded, one of the conclusions the MSB must reach is "that the service already provided by vessels of United States registry is inadequate." 46 U.S.C. § 1175(c) (1976). The MSB explained that the threshold issue it faced in making this determination was "the proper definition of the pool of cargo [demand] against which available capacity [supply] is to be compared." *Atlas Marine Co.,* 18 Shipping Reg. Rep. (P&F) 987, 999 (1978). The MSB found that "the relevant pool of cargo is that bulk cargo which would move in the preference trade." *Id.* Then, the MSB compared the projected supply of tankers and dry bulk vessels against the available cargoes reserved to United States-flag vessels.[26] *Id.* at 1003–04. Concluding that the projected total demand would exceed vessel supply by an amount greater than the capacity of all seven of plaintiffs' vessels, the MSB determined that granting plaintiffs' applications would not result in overtonnaging the bulk preference trades. *Id.* at 1004–10.

Despite a clear § 605(c) inadequacy determination by the MSB that all seven of plaintiffs' ships could be accommodated in the preference trades,[27] defendants assert that the MSB found only a two ship deficit in United States-flag bulk vessel capacity. Defendants reason that an examination of the projected cargo carried only by tankers in the two categories of preference trade in which plaintiffs propose to participate reveals only a two vessel deficit. While defendants' assertion may be accurate if one focuses only on tankers and two of the five preference categories, defendants' reasoning is inconsistent with the MSB's findings in its § 605(c) opinion. Defendants' argu-

**26.** The five categories are Strategic Petroleum Reserve, Military Sealift Command, Soviet Grain, P.L. 480, and A.I.D.

**27.** The MSB's 605(c) opinion was its final determination of the inadequacy issue. The MSB's tentative and final opinions in the instant case do not reconsider the inadequacy issue.

ment is merely a post hoc rationalization, *see Burlington Truck Lines v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962), which has "traditionally been found to be an inadequate basis for review." *Overton Park*, 401 U.S. at 419, 91 S.Ct. at 825. This Court cannot affirm the MSB's decision on a ground that the MSB has rejected.

It is inappropriate in the instant case, however, to remand this issue to permit the MSB to explain its reasoning more fully. This is not a case where the agency has reached conclusions that merely were inadequately explained by the administrative record. Rather, defendants are advancing an argument that already has been rejected by the agency itself. For example, the MSB rejected defendants' desire to consider only tanker supply and demand when it concluded that any "division between tanker and dry bulk [vessels] is a purely arbitrary one without significance" because most dry bulk cargoes "might be carried in either tankers or dry bulk ships." *Atlas Marine Co.*, 18 Shipping Reg. Rep. (P&F) 987, 1003 n.29. The MSB also rejected focusing on only the two preference categories in which plaintiffs applied to participate when it determined that "the relevant pool of cargoes is that bulk cargo which would move in preference trade."[28] *Id.* at 999. Thus, it is clear that the MSB rejected the defendants' calculations and found at least a seven ship deficit in United States-flag bulk vessel capacity in the preference trades.

■ This Court's review of the MSB's factual determination of the vessel deficit is limited to discerning whether the MSB considered relevant factors in reaching a rational decision. *See Overton Park*,

401 U.S. at 415–16, 91 S.Ct. at 823–24. Since either tankers or dry bulk ships can carry most dry bulk cargo, the capacity of and cargo demand for dry bulk ships was a relevant factor for the MSB to include in its analysis. In addition, the three preference categories plaintiffs did not seek to enter were relevant factors for consideration by the MSB in its calculations. Because existing United States-flag unsubsidized vessels are free to ship in any of the five preference categories where demand is present, an unsubsidized carrier shipping cargo from one of the three preference categories that plaintiffs do not propose to carry will remove itself from the pool of vessels capable of carrying cargo in the two preference categories for which plaintiffs have applied. Therefore, the MSB's consideration of relevant factors enabled it to reach a rational determination that there was at least a seven ship deficit in United States-flag bulk vessel capacity in the preference trades.[29]

B. *Exclusion of Five Vessels from the Preference Trades, Despite a Favorable 605(c) Hearing, To Protect Existing Unsubsidized Carriers*

■ The MSB must make two determinations under § 605(c) before an ODS can be granted: (1) "that the service already provided by vessels of United States registry is inadequate;" and (2) "that in the accomplishment of the purposes and policy of this chapter additional vessels should be operated thereon." 46 U.S.C. § 1175(c) (1976). The purposes and policy "determination is to be made independently of the inadequacy determination; that is, there are two independent requirements (inadequacy and furtherance of the Act's policies) to be made before an ODS award can be made." *Sea-Land Service, Inc. v. Kreps*,

**28.** Intervenor AMA argues that the "Board said in its Opinion that the true question is 'the reserved portion of the U.S. bulk preference trades into which the . . . [plaintiffs'] proposed service which they have not been providing.'" Defendants, however, have taken the MSB's statement out of context. The MSB's statement involved an entirely different issue which had no relationship to the measurement of the cargo pool: whether plaintiffs' applications

were for a new or existing service within the meaning of § 605(c). *See Atlas Marine Co.*, 18 Shipping Reg. Rep. (P&F) 987, 996 (1978).

**29.** The MSB's finding of an inadequacy of at least seven ships also furthers one of the major goals of the 1970 amendments which was to encourage the operation of bulk vessels. *See* S.Rep. No. 91–1080, 91st Cong., 2d Sess. 34 (1970).

566 F.2d at 773 n.50. Accordingly, the proper approach for the MSB to follow in any § 605(c) proceeding is first to make an inadequacy determination. Yet, § 605(c) uses the term "inadequate" without providing any guideposts as to the practical meaning of the term. *Id.* at 767 n.18. The Secretary of Commerce, however, has specifically tied the inadequacy determination to the § 101 policy of providing vessels "sufficient to carry a substantial portion" of United States foreign commerce. 46 U.S.C. § 1101 (1976). The term "substantial" has in turn been interpreted to mean 50%. *Sea-Land Service, Inc. v. Kreps,* 566 F.2d at 767 n.18. After the inadequacy determination has been made, the MSB must then consider· whether granting the ODS would be consistent with the broader purposes and policies of the Act. *Id.* at 765 n.3, 775–78 (construing second determination to refer to Act's broader purposes such as promoting foreign commerce and enhancing national defense).

▇▇▇ In the instant case, however, the MSB's procedures were inconsistent with the approach outlined by the D.C. Circuit in *Sea-Land Service.* After issuing a 605(c) opinion which found that there was at least a seven vessel inadequacy and that the operation of these vessels would further the Act's purposes and policy, the MSB examined the broader purposes of the Act outside the context of the § 605(c) proceedings. It was not until its tentative opinion that the MSB formulated its position that five of the seven plaintiffs' vessels should be barred from the preference trades to protect existing unsubsidized carriers. Following the approach outlined in *Sea-Land Service,* however, the desire to protect unsubsi-

dized carriers, one of the broader purposes of the Act, should have been considered in the MSB's 605(c) hearing and opinion.

Both rationales offered by defendants fail to justify the MSB's procedures in the instant case. First, the Government argues that the MSB is not precluded from considering the broader purposes of the Act under other provisions of the Act. While this argument may be true where no § 605(c) proceedings are held or where the MSB considers particular aspects of other provisions of the Act, it cannot relieve the MSB from considering the broader purposes of the Act under § 605(c). Otherwise, the MSB would be able to circumvent the requirement that it make a § 605(c) determination that additional service is consistent with the purposes and policy of the Act. Second, Intervenor AMA argues that the MSB explicitly reserved consideration of the effect on existing unsubsidized carriers. This argument is factually incorrect. At most, the MSB reserved its consideration of the effect that particular rates for subsidized ships would have on the unsubsidized carriers. The MSB did not hold open for later consideration the possibility of excluding plaintiffs' vessels from the preference trades in order to protect existing carriers.[30] *See Atlas Marine Co.,* 18 Shipping Reg. Rep. (P&F) 987, 1011 (1978).

The MSB's procedural error is harmless and thus not a basis for a remand. While the MSB's approach was unconventional, it afforded plaintiffs an adequate opportunity to comment on the MSB's decision to give additional protection to unsubsidized carriers. Thus, this Court must consider whether the MSB had the authority to bar five of plaintiffs' seven vessels from the preference trades.

---

30. The MSB, in another context, has argued that the "purposes and policy" language of § 605(c) was included to refer back to the § 101 goal of carrying a substantial portion of United States foreign commerce. *See American President Lines, Ltd.,* 2 Shipping Reg. Rep. (P&F) 633, 667–68 (1963). Although this may have been one of the reasons this language was included in § 605(c), one would have to ignore the plain language of the statute to conclude that it was the exclusive reason. Section 605(c) specifies "purposes," thereby suggesting that there is more than one purpose to consider. Moreover, "inadequacy" would be meaningless without the reference back to § 101. Hence, the relation back to § 101 is essential for the MSB to make an inadequacy determination. The D.C. Circuit has specified that the inadequacy and "purposes and policy" determinations were separate and independent. Therefore, in order for there to be a "purpose and policy" determination, other purposes and policies of the Act must be considered.

Since the passage of the Act, the major goal of expanding the United States-flag fleet has been tempered by attempts to protect existing carriers. *See* H.R.Rep. No. 1277, 74th Cong., 2d Sess. 23 (1935). *Cf. Pacific Far East Line, Inc. v. Federal Maritime Bd.*, 275 F.2d 184 (D.C.Cir.), *cert. denied*, 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1523 (1960). As a result, the issue in the instant case is not whether the MSB can protect existing unsubsidized carriers under § 605(c). Rather, this Court must determine whether, after a determination of at least a seven ship deficit in United States-flag bulk carriers, the MSB still could bar five of those seven ships from operating in the preference trades.

An examination of the legislative history which accompanied the 1970 Amendments reveals that the option of barring subsidized carriers entirely from the preference trades was rejected. Initially, it is clear that Congress and the Executive Branch recognized that they needed to provide some mechanism to ensure a smooth transition from a system of unsubsidized bulk carriers to one of subsidized bulk carriers. Andrew Gibson, Department of Commerce Maritime Administrator and spokesman for the Executive Branch during the congressional hearings on the 1970 Amendments, concluded: "There are a number of operators that have made total investments without any Government subsidy either in a few new ships, [or] quite a few substantially rebuilt jumboized ships that are now in the grain trades. These operators clearly have to be protected." ·President's Maritime Program (Part 1): Hearings on H.R. 15,424, Before the House Subcomm. on Merchant Marine of the Comm. on Merchant Marine and Fisheries, 91st Cong., 1st Sess. 57 (1969) (hereinafter cited as House Hearings—Pt. 1).

While there was no question that the 1970 Amendments presented a transition problem, the focus of this Court's inquiry is what specific measure did the Administration commit itself to employ to facilitate this transition. Gibson testified on three occasions before Congress prior to the passage of the 1970 Amendments and provided more detailed transition plans each time. On October 28, 1969, Gibson outlined the Administration's initial thoughts on handling the transition problem:

> We would propose, *I think*, during the initial period, that initial period being 1 or 2 years, and it would depend on the number and size of this fleet at the time, that these ships *probably* would be precluded from carrying preference cargoes or certainly get last priority, and we look forward to the phasing-in of these ships so that the present fleet is not subject to unfair competition from other American carriers.

*Id.* (emphasis added). Although he did mention the possibility of excluding subsidized carriers during the transition period, this statement was only his initial observation concerning the steps he planned to recommend to solve the transition problem.

On January 29, 1970, Gibson returned for additional testimony in which the following dialogue occurred:

> Mr. Keith. How are you going to be fair to those nonsubsidized operators that are currently in existence, if you try to wash out the advantage between one and the other?
>
> Mr. Gibson. I will tell you what we had contemplated, and this can certainly be done administratively, *and I would make this certainly a matter of record of the intent of the present administration.*
>
> For Government cargoes, and this would probably be a main source of cargo for a number of these ships, and talking about a period 3 years from now, for the 2 years following that, we would propose that the priority for Government cargoes—and this would be primarily the grain cargoes under Public Law 480—would be reserved for the nonsubsidized fleet, and the subsidized operator would come in only after there were no takers, or there were no takers at decent rates.
>
> I wouldn't want to be held to any precise period, but the way we see it, at the end of five years, there are relatively few ships of the type we are describing left.

Time has taken its toll. . . . Probably, looking now 5 years hence at those few ships which remain in this trade, we would bring them under a subsidy blanket for operating subsidy, so that for the operating subsidy everybody would be the same.

President's Maritime Program (Part 2): Hearings on H.R. 15,424 Before the Subcomm. on Merchant Marine of the Comm. on Merchant Marine and Fisheries, 91st Cong., 2d Sess. 201–02 (1970) (emphasis added) (hereinafter cited as House Hearings—Pt. 2). In Gibson's last appearance before Congress prior to the passage of the 1970 Amendments, he confirmed that the Administration intended to establish a priority system favoring unsubsidized carriers until all carriers could be placed on ODS. *See* The Maritime Program: Hearings on S. 3287 Before the Senate Subcomm. of Merchant Marine of the Comm. on Commerce, 91st Cong., 2d Sess. 72–73 (1970) (hereinafter cited as Senate Hearings).

In sum, as the Administration's proposal became more detailed and refined, the suggestion that subsidized carriers might be barred from the preference trades during the transition period was dropped. Although Gibson never stated explicitly that the preclusion option was rejected, this Court finds persuasive support for this conclusion in the elimination of the preclusion option from Gibson's final two statements. Moreover, Gibson omitted the preclusion option during a statement that he considered was "a matter a record of the intent of the present administration." House Hearings —Pt. 2, *supra.*

■ Not only is there persuasive support in the legislative history of the 1970 Amendments that the MSB has no power to bar subsidized vessels from the preference trades during the transition period, but barring the plaintiffs' vessels also is inconsistent with the major goal of the Act and the 1970 Amendments. Assuming, *arguendo,* that the legislative history of the 1970 Amendments is ambiguous on the issue of exclusion of subsidized vessels, this Court "must of necessity look to the *purposes*

underlying the particular statutory provision and the Act in general." *Sea-Land Service, Inc. v. Kreps,* 566 F.2d 763, 768 (D.C. Cir. 1977). Although § 605(c) is designed to protect existing carriers, *see* H.R. Rep. No. 1277, 74th Cong., 2d Sess. (1935), this purpose must be achieved within the context of an Act and its 1970 Amendments whose major goal is to expand the United States-flag fleet to further foreign commerce and national defense. To reconcile this major goal of the Act with the § 605(c) purpose to protect existing carriers, the MSB should select measures to protect existing carriers which have the least impact on the growth of the United States-flag fleet.

In the instant case, a priority system will further the expansion of the United States-flag fleet while providing no less protection to unsubsidized carriers than would preclusion of subsidized carriers from the preference trades during the transition period. Any priority system the MSB is likely to establish initially would reserve preference trade for the unsubsidized carriers, "and the subsidized operator would come in only after there were no takers, or there were no takers at decent rates." House Hearings—Pt. 2 *supra* at 201. Hence, a priority system would protect unsubsidized carriers by giving them the initial opportunity to carry preference trade. Where these unsubsidized carriers are unavailable and foreign-flag vessels would otherwise carry the preference cargo, the subsidized carriers would be permitted to carry the preference cargo. Since the subsidized carrier could not carry preference cargo unless unsubsidized carriers were unavailable, barring the subsidized carriers entirely from the preference trades would serve no additional protective purpose. The entry of the subsidized carriers would come at the expense of foreign-flag carriers who would have carried the cargoes. Moreover, permitting the entry of subsidized carriers into the preference trades would increase the operation of United States-bulk carriers and would provide incentives to expand the United States-flag bulk fleet.

Although this Court is remanding the instant case to the MSB to afford it an opportunity to implement a priority system,[31] it is important to note that it is doubtful whether the MSB can justify even a priority system to protect unsubsidized carriers. As Gibson detailed, the purpose for protecting unsubsidized carriers was to ensure that these carriers could depreciate fully investments made without ODS:

You have a number of bulk carriers today. A few actually have built new ships. Several of them have made substantial investments in modifying war-built tonnage by jumboizing, improving machinery, to a point where they have several million dollars of unamortized investment in those ships.

I wouldn't want to be held to any precise period, but the way we see it, at the end of five years [after passage of the Act], there are relatively few ships of the type we are describing left. Time has taken its toll.

... ships that were war-built tonnage that these companies obtained for little or no cost and paid to modernize ... by this time are almost fully depreciated.

... Probably, looking now 5 years hence at those few ships which remain in this trade, we would bring them under a subsidy blanket for operating subsidy....

I think this type of proposal ... would give the few operators that have made substantial investments in either new tonnage or upgrading their tonnage, and they are relatively few, an assurance of getting the return on their investment.

And to the extent that these few ships are going to be economical beyond this 5-year period, it would, I think, assure

them of an equitable competitive position with the new types.

House Hearings—Pt. 2, *supra* at 201–02, 640. Because it was nine years after the 1970 Amendments that the MSB issued its final opinion in this case, it is likely that all the unsubsidized carriers had depreciated fully any investments they had made.[32] Thus, the reason that legislators were concerned with protecting the unsubsidized carriers is likely to exist no longer.

A final reason that this Court questions whether a priority system is necessary is the MSB's own finding that plaintiffs will be carrying cargoes that the unsubsidized carriers do not presently carry. The MSB concluded in its § 605(c) opinion that:

In the case of the seven existing tankers, which would carry dry bulk in lots of no less than 55,000 long tons, the record shows that the amount of preference tonnage which has historically moved in U.S.-flag bottoms in such large lots is practically nil. If there are such lots regularly assigned (the record is not clear on this point), they must currently be moving in foreign bottoms.

*Atlas Marine Co.*, 18 Shipping Reg. Rep. (P & F) 987, 1008–09 (1978). Accordingly, there should be no need to protect unsubsidized carriers if the plaintiffs will carry cargoes that the unsubsidized carriers do not carry. Despite the view that it is unlikely that a priority system can be justified, this Court will defer to the MSB so that it will have an opportunity to decide whether a priority system is necessary. The MSB, at least, will be aware that this Court questions the need for a priority system based on the present administrative record.

**31.** This remand also permits the MSB to place other conditions on plaintiffs' receipt of the ODS. *See* Part III of this opinion, *infra*, for the conclusion that the MSB has the power to condition the receipt of ODS on the setting of world rates.

**32.** The reason the MSB has submitted for the continued operation of unsubsidized, war-built vessels has been the Alaskan oil trade which

began in 1977. *See* Defendants' Exhibit No. 1, at 17–18. While these vessels have outlasted the five years predicted for their demise, their continued operation does not justify additional protection as long as the unsubsidized carriers have been able to depreciate fully the investments made prior to the passage of the 1970 Amendments.

III. *The MSB's Requirement that Aeron Vessels Carry Preference Trade at World Rates*

A. *The Authority of the MSB to Condition Receipt of ODS on Vessels Carrying Preference Cargo at Specified Rates*

■ There are two grounds for sustaining the MSB's rate conditions. First, § 603 of the Act permits the MSB to grant ODS "subject to such reasonable terms and conditions consistent with this Chapter, as the Secretary of Commerce shall require to effectuate the purposes and policy of this chapter ..." 46 U.S.C. § 1173(a) (1976). Second, § 601 of the Act instructs that "[n]o such application shall be approved by the Secretary of Commerce unless he determines that (1) the operation of such vessel or vessels in an essential service is required to meet foreign-flag competition ..." 46 U.S.C. § 1171(a)(1) (1976). The following discussion explains why either of these statutory provisions is sufficient to uphold the MSB's rate conditions.[33]

Section 603 allows the MSB to grant ODS subject to any reasonable terms consistent with the purposes and policy of the Act. Essentially, plaintiffs argue that although Congress in the 1970 Amendments did intend for carriers receiving ODS to carry cargo at world rates, *see* H.R. Rep. 91–1073,

91st Cong., 2d Sess. 38 (1970), the mechanism with which Congress intended to achieve these rates was competitive bidding. Thus, to accept plaintiffs' argument, this Court must find that the legislative history of the 1970 Amendments blocks the MSB from fixing rates as a means to facilitate the carriage of preference cargoes by United States-flag carriers at world rates.

Examination of the legislative history of the 1970 Amendments indicates that Congress never barred the MSB from imposing rate conditions on subsidized carriers and that Congress endorsed preventing subsidized carriers from collecting premium rates while engaging in the preference trades. At several points during congressional hearings on the 1970 Amendments, it was suggested that subsidized carriers receiving ODS would be able "to bid on preference cargoes at world rates." Senate Hearings, *supra* at 72; House Hearings—Pt. 1, *supra* at 60 (statements of Maritime Administrator Andrew Gibson). While this testimony does suggest that competitive bidding was one means which could be employed to achieve world rates, it does not suggest that competitive bidding was either the exclusive or the necessary means to accomplish the Act's objective of world rates. In fact, Gibson endorsed barring

---

**33.** Two other arguments were advanced to support the MSB's action. Defendants contended that Aeron's existing ODS contracts with the MSB contain clauses which grant the MSB broad authority to require Aeron to set certain rates for the carriage of cargo. This argument can be dismissed without examining the specific provisions of these ODS contracts because no contract, however broad, can grant the MSB power to engage in activities beyond its statutory authorization. A second argument proffered to sustain the MSB's action by Intervenor AMA is that the 1970 Amendments to § 901(b)(2) empower the Secretary of Commerce, through the MSB, to set rates. Section 901(b)(2) provides that "[e]very department or agency having responsibility under this subsection shall administer its programs under regulations issued by the Secretary of Commerce." 46 U.S.C. § 1241(b) (1976). Although this statutory provision appears to give the MSB broad powers to issue regulations concerning cargo preference trade, *see* S.Rep. 91–1080, 91st Cong., 2d Sess. 58–59 (1970), it is irrelevant in

the instant case because no rules or regulations were issued. *See* Transcript of Hearing on Cross-Motions for Summary Judgment—*Aeron Marine Shipping Co., et al. v. United States, et al.*, at 37–38 (January 13, 1981) (The Government concedes no claim for world rate authority under § 901). Nevertheless, the broad powers granted to the MSB do demonstrate that plaintiffs' contention that § 901 denies the MSB authority to set rate conditions is erroneous. Prior to the 1970 Amendments, plaintiffs may have argued successfully that § 901 required the agency administering the program which generated the preference cargo to establish the terms of the shipping agreement with the carrier. With the supervisory powers granted the MSB by the 1970 Amendments, the MSB now has the same power to establish regulations for the carriage of preference cargo as does any agency which generates the cargo. Thus, while § 901 is not a justification to impose rate conditions in the instant case, there is no basis to suggest it bars the MSB from imposing rate conditions.

subsidized carriers from receiving premium rates when they carried preference cargo.

Mr. Pelly. Well, am I right though, that as far as the time schedule goes that the phaseout would occur over a 5-year period?

Mr. Gibson. That is what we have contemplated and it may have to be longer, but certainly 5 years.

Mr. Pelly. During the first 3 years while the subsidized bulk carriers are being built, there would be no change?

Mr. Gibson. There is no effect; right.

Mr. Pelly. Then during the following 2 years—

Mr. Gibson. At least.

Mr. Pelly. Or longer possibly, *subsidized bulk carriers would be allowed into the Government cargo field but would not be allowed any advantageous rates*?

Mr. Gibson. *That is correct.*

House Hearings—Pt. 2, *supra* at 640–41 (emphasis added). Thus, it follows that the MSB should have the authority to require subsidized carriers in the preference trades to set world rates in order to ensure that subsidized carriers do not receive advantageous rates.

Assuming, *arguendo*, that the legislative history is ambiguous on the permissibility of the MSB's rate conditions, this Court should consider whether the MSB's decision advances the purposes and policies of the Act and its 1970 Amendments.[34] *See Sea-Land Service, Inc. v. Kreps, supra* at 774. In contrast to the MSB's exclusion of five of plaintiff's vessels from the preference trades which was inconsistent with the goal of the 1970 Amendments to expand the United States-flag bulk fleet, requiring the

subsidized carriers to set world rates furthers the 1970 Amendments' "aim to enable American bulk carriers, eventually at least, to carry government cargoes at world rates."[35] H.R. Rep. 91–1073, 91st Cong., 2d Sess. 38 (1970). It is well established that Congress anticipated a transition period of approximately five years. *See* House Hearings—Pt. 2, *supra* at 640 (statement of Maritime Administrator Andrew Gibson). When the MSB imposed the rate conditions challenged in the instant case, eight years had already elapsed. Since the MSB's world rate conditions speeds the shift from a system of unsubsidized bulk carriers receiving premium rates to a system of subsidized bulk carriers receiving world rates, one of the goals of the 1970 Amendments, the MSB's action can be sustained on an additional ground.

The second statutory provision which provides an independent basis to uphold the MSB's world rate conditions is § 601(a)(1) which prohibits the award of ODS unless "the operation of such vessel or vessels in an essential service is required to meet foreign-flag competition." 46 U.S.C. § 1171(a)(1) (1976). In the instant case, the MSB acted within its statutory authority when it determined that Aeron's subsidized bulk vessels had to follow world rates in order to meet foreign-flag competition. *See* Defendant's Exhibit No. 2, *supra* at 5–6.

To understand why the MSB acted within its § 601(a)(1) authority, it is necessary to review the D.C. Circuit's affirmance of the MSB's decision in a case involving a similar issue of under what conditions subsidized liner vessels could operate in the preference

---

**34.** Unlike the MSB's exclusion of plaintiffs' vessels from the preference trades which was based on a means abandoned by the Nixon Administration in its final transition plans in favor of a priority system, the desire to preclude subsidized carriers from receiving advantageous rates for preference cargoes was articulated near the conclusion of Mr. Gibson's congressional testimony on February 25, 1970. Hence, there is no support for the argument that the Administration denied the MSB authority to impose rate conditions when it formulated its final transition plans.

**35.** Instead of interpreting the terms "eventually at least," as plaintiffs have suggested, to mean that the transition from premium to world rates must be accomplished by competitive bidding, it is reasonable to interpret this language to mean that the House recognized that a transition period would be necessary before the goal of achieving world rates would be satisfied. This language does not indicate which means should be employed to achieve that goal.

trades. In *States Marine Int'l, Inc. v. Peterson*, 518 F.2d 1070, *cert. denied* 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976), the MSB promulgated regulations which reduced ODS payments for each service covered by an ODS contract if a substantial portion of revenues for that service was earned from the carriage of cargoes which were not subject to foreign-flag competition. *Id.* at 1075. In interpreting these regulations, the MSB concluded that preference traffic carried at world rates, but not premium rates, would be subject to foreign-flag competition. *Id.* The MSB reasoned that although foreign-flag carriers are ineligible to carry preference traffic, they directly influence the rate at which preference cargo is carried since the world rate for the preference cargo is calculated from the rates of the ineligible foreign carriers. *See* Defendant's Exhibit No. 2, *supra* at 6. The D.C. Circuit upheld the MSB's regulations, concluding that Congress contemplated the payment of some double subsidies (receiving ODS and charging rates which exceed world rates) to shippers carrying preference cargo. *See States Marine Int'l v. Peterson*, 518 F.2d at 1082.

The MSB in the present case required that the two Aeron vessels follow world rates, but granted a fuel consumption differential for the Aeron vessels' outbound voyages. Because the MSB previously determined that foreign-flag competition will be met in the preference trades only when world rates are followed, the MSB had authority under § 601(a)(1) to require Aeron's vessels to set world rates for their carriage of preference cargoes. Moreover, since Congress did not preclude the MSB from allowing bulk carriers to receive rates greater than world rates during the transition period, *see* H.R.Rep.No. 91–1073, 91st Cong., 2d Sess. 38 (1970); *States Marine Int'l v. Peterson*, 518 F.2d at 1082 (double subsidies contemplated by Congress in some

instances), the MSB had the authority to grant a fuel consumption differential. Thus, § 601(a)(1) which requires carriers to meet foreign-flag competition is another ground to support the MSB's authority to condition receipt of the Aeron vessels' ODS on the setting of world rates.

### B. *The Reasonableness of the World Rates Imposed by the MSB*

Aeron claims that even if the MSB had the authority to impose rate conditions, the MSB's provision of a fuel consumption differential only for outbound voyages was unfair and unreasonable. *See* 46 U.S.C. § 1241(b)(1) (1976). Before deciding whether the MSB's factual determination of the appropriate rate level for Aeron's vessels was arbitrary and capricious, it is necessary to resolve what evidence will be considered in deciding this claim. Among the documents submitted for this Court's consideration of the one-way fuel consumption differential are 1) affidavits to support plaintiffs' cross-motion for summary judgment; 2) defendants' Staff Review of Subsidized Vessel Participation in the Cargo Preference Trades which evaluates the Aeron experience over the two years since the MSB's final opinion in the instant case was written; and 3) plaintiffs' comments concerning defendants' staff review.[36]

The Supreme Court has cautioned that a court reviewing an agency action under the arbitrary and capricious standard should focus on the "administrative record already in existence, not some new record made initially in the trial court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). "Where a party to an administrative dispute has been given a fair opportunity to present evidence and make his contentions in administrative proceedings, with rare exceptions he will be bound by the record there made." *Williams v. Robinson*, 432 F.2d 637, 642 (D.C.Cir.

**36.** After defendants submitted their Staff Review, plaintiffs filed a motion to strike. Plaintiffs, however, recently retracted their motion to strike when defendants agreed not to challenge plaintiffs' submission of their comments on defendants' Staff Review of this Court. In

tervenor AMA has filed an opposition to plaintiffs' motion for leave to supplement the record. If this Court were to grant plaintiffs' motion, then AMA has requested that it also have an opportunity to supplement the record.

1970). Supplemental information may be considered by a court in order to understand otherwise inexplicable administrative action or to determine the relevant factors considered by the agency in reaching its determination. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419–421, 91 S.Ct. 814, 825–826, 28 L.Ed.2d 136 (1971).

▮▮ None of the extra record materials submitted to this Court in the instant case will be considered. With respect to plaintiffs' affidavits, the MSB afforded plaintiffs a fair opportunity to present the arguments contained in the affidavits during the administrative proceedings. After the MSB issued its tentative opinion which informed plaintiffs of the proposal to require world rates with a one-way fuel consumption differential, *see* Defendant's Exhibit No. 1, *supra* at 19–22, the MSB afforded all interested parties an opportunity, which plaintiffs exercised, to submit their views on the tentative opinion. As the MSB's final opinion indicates, the MSB fully considered plaintiffs' objections when it reached its final determination that the rates imposed in the tentative opinion should remain intact. *See* Defendant's Exhibit No. 2, *supra* at 10–12. Hence, plaintiffs had a fair opportunity to present their arguments during the MSB's administrative proceedings. Moreover, there have been no new developments in the instant case which require this Court to consider the affidavits. Plaintiffs concede that "the fundamental arguments contained in the affidavits were presented to the Board and fully considered in its Final Opinion." Plaintiffs' Reply Memorandum with Respect to Cross-motions for Summary Judgment, at 8. Therefore, because the MSB's final opinion adequately discloses the factors considered by the MSB and because the affidavits offer little, if anything new, *see NAACP v. Wilmington Medical Center, Inc.*, 453 F.Supp. 280, 305–06 (D.Del.1978), *rev'd on other grounds*, 599 F.2d 1247 (3rd Cir. 1979), this Court will not consider plaintiffs' affidavits.

Despite the willingness of the plaintiffs and the Government to permit the introduction of defendants' Staff Report and plaintiffs' comments concerning that report, this Court will not consider these documents because they concern administrative action that is not presently for review by this Court. The MSB's Staff Report represents the beginning of the MSB's examination of the effects of its final opinion, a review to determine whether its policies during the transition period have been effective. Plaintiffs' comments concerning the Staff Report were invited by the MSB after the Staff Report was released. 46 Fed.Reg. 29,300 (June 1, 1981). Whatever the MSB's final decision on the current viability of the policies expressed in the MSB's final opinion in the instant case, that final opinion will be a separate and distinct administrative determination for which plaintiffs may seek judicial review at the appropriate time.[37] Thus, this Court will not consider the defendants' Staff Report and the plaintiffs' comments since the review in the instant case is limited to the propriety of the MSB's final opinion which has been in effect for over two years.

▮▮ The limited nature of this Court's review of the MSB's rate conditions on the Aeron vessels under the arbitrary and capricious standard is reinforced by congressional intent that this issue is particularly within the MSB's expertise to determine. *See generally Ethyl Corp. v. EPA*, 541 F.2d 1, 34–37 (D.C.Cir.) (*en banc*), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Congress recognized that:

> [W]e have no experience on which to draw to compare American and foreign operating costs in the commercial bulk trades ... the Secretary [will] pay operating-differential subsidy to bulk carriers "as he shall determine to be necessary" to make the cost of operating such vessels "competitive" with foreign-flag ships.

**37.** The only relevance the Staff Review and related proceedings have for the instant case is that they potentially could moot plaintiffs' claims if the MSB were to abandon its final opinion in the instant case. Yet, not even a tentative opinion by the MSB has been issued to this point in its reexamination of the Aeron experience.

This provision, obviously, extends broad authority to the Secretary without specific standards for administration of the authority, but we think that at least in this innovative period when we are trying to enter a competitive market, from which our carriers have been effectively excluded, such broad discretion is required.

H.R.Rep.No. 91–1073, 91st Cong., 2d Sess. 38–39 (1970). *See* S.Rep.No. 91–1080, 91st Cong., 2d Sess. 34–35 (1970). Because of the broad discretion Congress intended the MSB to have in determining fair and reasonable rates for bulk carriers, this Court should not overturn the MSB's judgment unless its decision is irrational.

■ The first ground on which this Court sustains the MSB's judgment is that the "fair and reasonable rates" requirement does not mean that every potential carrier of bulk preference trade should be permitted to set rates which guarantee profits.[38] The legislative history which accompanied the enactment of § 901 of the Act supports this proposition. In interpreting the "fair and reasonable rate" language shortly after the passage of the 1954 Cargo Preference Law, Comptroller General of the United States Herbert C. Bonner reported:

> In the ordinary sense of the words used, they would appear to call for reasonable compensation to the operator including a fair profit. However, it seems apparent that the statute contemplates average "fair and reasonable rates" which may or

may not be profitable, or even compensatory, to a high-cost operator.

Administration of Cargo Preference Act: Hearings on Pub.L.No. 664 Before the Comm. on Merchant Marine and Fisheries, 84th Cong., 1st Sess. 178–79 (1955).[39]

■ In the instant case, Aeron contends that it needs a fuel consumption differential to be competitive with foreign-flag carriers. Yet, Aeron admits that the reason for its competitive disadvantage is that it operates a steam-powered propulsion system, while many foreign-flag carriers and some United States-flag carriers operate a diesel-powered system. The MSB is not obligated to set a rate which ensures that high-cost operators such as Aeron, due to its steam-powered system, will make a reasonable profit. There is no statutory obligation for the MSB to act as an insurer against Aeron's business judgment to employ a steam-powered propulsion system.

Assuming, *arguendo*, that the MSB has some obligation to ensure that all bulk preference carriers make a reasonable profit, Aeron still has failed to establish that the MSB's allowance of world rates plus a one-way fuel consumption differential is not a rational attempt to provide Aeron with a reasonable profit. Unlike unsubsidized carriers that must charge premium rates, Aeron as a subsidized carrier will be able to compete with foreign-flag vessels so that backhaul movements (foreign-to-foreign or U.S. import trade) may be reasonably con-

**38.** Plaintiffs rely on *Bluefield Water Works and Improvement Co. v. Public Service Commission of W. Va.,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), for the proposition that administrative agencies engaging in rate regulation must set rates which allow a fair profit. Not only does this argument ignore the legislative histories of the 1954 Cargo Preference Act and the 1970 Amendments which empower the MSB to require world rates, but it also ignores the vastly different factual circumstances in *Bluefield* and the instant case. Because *Bluefield* involved a public utility which was a monopoly supplier, it was necessary for the protection of consumers, as well as for the protection of the public utility, that a reasonable profit could be earned. In contrast, the MSB is

merely imposing rate conditions, consistent with congressional intent, on private, potential entrants to the bulk preference trades. There is no obligation to ensure rates which generate profits to all potential carriers in order to provide an adequate supply of shipping.

**39.** Plaintiffs erroneously argue that the § 901 reference to United States-flag carriers in conjunction with "fair and reasonable rates" precludes the MSB from considering foreign-flag (world) rates. After the 1970 Amendments extended ODS to United States-flag bulk carriers, however, world rates may be "fair and reasonable" for United States-flag carriers. Hence, the § 901 reference to United States-flag carriers does not freeze the fair and reasonable rate at the premium rate level.

templated.[40] Nevertheless, Aeron argues that it will not be competitive because it still has a fuel consumption disadvantage on any inbound voyage. As Intervenor AMA suggests, however, Aeron is paid by its time charterers for any operating costs, including fuel costs, which are not covered by ODS. *See* AMA's Memorandum in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, at 15–16. Hence, Aeron will be compensated for any backhaul fuel costs so that it can charge world rates on backhauls without being at a competitive disadvantage. Finally, Aeron fails to demonstrate that world rates plus a fuel consumption differential outbound will not produce a reasonable profit whether or not there is any empty backhaul.[41] Thus, given the MSB's wide latitude to determine "fair and reasonable rates," this Court finds that the requirement of world rates plus a fuel consumption differential outbound was not an abuse of the MSB's discretion.

█ In sum, the MSB must permit the entry of five of plaintiffs' ships into the preference trades. This matter is remanded to the MSB, however, to determine the necessity of a priority system and rate conditions for the five vessels. The MSB's condition of world rates plus a fuel consumption differential for the Aeron vessels was within its statutory authority and was not an abuse of its broad discretion to determine "fair and reasonable rates" for bulk vessels in the preference trades. An Order consistent with this opinion will be filed this date.

**40.** Although Aeron's world rates will reflect the costs of only its outbound voyage, those world rates will hinge on the one-way rates of foreign-flag carriers. Because the one-way rates for foreign-flag carriers should reflect the risk of an empty backhaul, that risk also should be imputed in the world rates Aeron must follow.

In addition, even if this Court considers plaintiffs' supporting affidavits, the affidavits primarily concern the difficulties in obtaining backhauls. Instead of relying on the questionable predictions in the affidavits to reverse the MSB, it would be more prudent for plaintiffs to apply for an ODS adjustment under § 606 if they actually do experience difficulties obtaining backhauls. *See* 46 U.S.C. § 1176 (1976).

**41.** Assuming that Aeron's fuel costs will not be covered by its time charterers, it still would be unclear that Aeron would be at a competitive disadvantage against foreign-flag carriers for backhauls. While Aeron may be at some competitive disadvantage with respect to fuel cost, Aeron ignores the possibility that it may enjoy a comparative advantage against foreign-flag carriers in its proximity to the potential backhaul (saving operating costs necessary to sail to the backhaul's location) after unloading its preference cargo.