AERON MARINE SHIPPING COMPA-
NY, et al., Appellants,

v.

UNITED STATES of America, et al.

AERON MARINE SHIPPING
COMPANY, et al.

v.

UNITED STATES of America, et al.

American Maritime Association,
Appellant.

AERON MARINE SHIPPING
COMPANY, et al.

v.

UNITED STATES of America, et
al., Appellants.

Nos. 81–2294, 81–2355 and 81–2379.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1982.

Decided Nov. 23, 1982.

Mark P. Schlefer, Washington, D.C., with whom Michael Joseph and Thomas L. Mills, Washington, D.C., were on the brief, for Aeron Marine Shipping Co., et al., appellants in No. 81–2294 and cross-appellees in Nos. 81–2355 and 81–2379.

Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and Royce C. Lamberth and John Oliver Birch, Asst. U.S. Attys., Washington, D.C., were on the brief, for United States of America, et al., appellees in Nos. 81–2294 and 81–2355, and cross-appellants in No. 81–2379.

Kenneth M. Raisler, Asst. U.S. Atty., and Michael Kimmel, Atty., Dept. of Justice, Washington, D.C., also entered appearances for United States of America, et al.

Joseph A. Klausner, Washington, D.C., with whom Allan A. Tuttle, Washington,

D.C., was on the brief, for American Maritime Ass'n, appellees in Nos. 81–2294 and 81–2379, and cross-appellant in No. 81–2355.

Before ROBINSON, Chief Judge, and WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellant Aeron Marine Shipping Company ("Aeron") petitioned appellee Maritime Subsidy Board for permission to carry foreign preference cargos on seven subsidized bulk cargo ships. The Subsidy Board granted the petition for only two of the seven ships, subject to the condition that the two ships carry preference cargos at world rates plus a one-way fuel differential allowance. Aeron sought review in the district court, arguing that (1) all seven ships should be admitted to the foreign preference trades; (2) the Subsidy Board had no authority to set rates; and (3) even if the Board could set rates, the chosen rate was unreasonable. The district court, in an opinion published at 525 F.Supp. 527 (D.D. C.1981), ordered the Board to admit all seven ships. However, it ruled that the Board had rate-setting authority and had set a reasonable rate.

Aeron appeals the district court's decision on the two rate issues and defendant-intervenor American Maritime Association cross-appeals the order to admit all seven ships. We affirm the district court's decision to order admission of all seven ships and its ruling that the Subsidy Board has authority to set rates. However, we cannot sustain the reasonableness of the Board's rate decision because the Board made key assumptions without supporting evidence. We therefore reverse the district court on this single issue and instruct the court to remand to the Subsidy Board to reconsider the proper rate.

## I. BACKGROUND

### A. *The Statutory Scheme*

This case involves the construction of several related statutes, enacted over several decades. The Merchant Marine Act of 1936 ("Act")[1] established an elaborate system for subsidizing both the domestic merchant marine and domestic shipbuilders. Congress believed that it was "necessary for the national defense" to have a merchant marine capable of carrying all "domestic" cargo (cargo shipped between two U.S. ports) and "a substantial portion" of all "foreign" (export and import) cargo. Merchant Marine Act § 101, 46 U.S.C. § 1101. It recognized, however, that high U.S. labor costs made U.S.-built and U.S.-manned ships uncompetitive with foreign ships. To provide U.S. ships with a protected market, Congress at various times reserved certain cargos, called "preference" cargos, for U.S. ships. In particular, the Cargo Preference Act of 1954[2] amended the Merchant Marine Act to require government agencies to use U.S. vessels for at least 50% of all foreign cargos that the United States has bought, sold, or provided financing for, so long as those vessels are "available at fair and reasonable rates for United States-flag commercial vessels." Merchant Marine Act § 901(b)(1), 46 U.S.C. § 1241(b)(1). The effect of the Cargo Preference Act is to indirectly subsidize U.S. ships by paying them premium rates, which in practice can be "more than twice that of the commercial foreign-flag market." H.R. Rep. No. 1073, 91st Cong., 2d Sess. 26 (1970) ("H.R.Rep.").

Unfortunately, these attractive rates available to U.S. ships under the premium rate system failed to induce new construction of U.S. "bulk" ships.[3] Therefore, Congress, in 1970, adopted a direct subsidy program. Under this program, new bulk ships could qualify for both "construction differ-

---

**1.** Ch. 858, 49 Stat. 1985 (1936) (current version at 46 U.S.C. §§ 1101–1295g).

**2.** Ch. 936, 68 Stat. 832 (1954) (codified at 46 U.S.C. § 1241).

**3.** By 1970, "[o]nly 3 percent of the [bulk cargo] fleet [was] less than 20 years old." H.R.Rep. at 121.

   "Bulk" vessels, which are chartered for specific voyages and carry large (usually shipload

ential subsidy" (CDS) and "operating differential subsidy" (ODS).[4] Congress designed CDS and ODS to bring the construction and operating costs of U.S. ships, net of subsidy, into parity with those of foreign ships.[5] It expected the direct subsidy program to encourage construction of new bulk ships. It also expected that eventually these new ships would carry foreign preference cargos[6] at world rates; the costly premium rate system would be phased out.[7]

At the same time, Congress protected investment in existing bulk ships that carried preference cargos at premium rates—so-called "unsubsidized" ships—in two ways. First, under Merchant Marine Act § 605(c), 46 U.S.C. § 1175(c), subsidized vessels would not be admitted to the preference trades at all unless the Secretary of Transportation[8] determined, after public hearing, that "the service already provided by vessels of United States registry is inadequate, and that in the accomplishment of the purposes and policy of this [Act] additional vessels should be operated thereon." Second, during a phase-in period of 5 years or so, by administrative action, "unsubsidized" ships were to receive priority for preference cargos—"the subsidized operator would come in only after there were no [unsubsidized] takers, or there were no takers at decent rates."[9]

### B. The Facts of this Case

Aeron owns seven subsidized 91,000-ton oil tankers, also suitable for carrying grain

---

size) shipments, are the only vessels at issue in this litigation. They are distinguished from "liner" vessels, which travel on a regular schedule along designated trade routes and carry small shipments.

4. Merchant Marine Act of 1970, Pub.L. No. 91–469, § 14, 84 Stat. 1018, 1023 (amending 46 U.S.C. § 1171(a)) (ODS). Liner vessels have been directly subsidized since 1936; the 1970 amendments added bulk vessels to the direct subsidy program. Although CDS had theoretically been available for bulk ships prior to 1970, in practice the Maritime Administration reserved the limited CDS funds for liner ships, which were the only ships eligible for ODS. *See President's Maritime Program, Part 2: Hearings on H.R. 15,424, H.R. 15,425, and H.R. 15,640 Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries*, 91st Cong., 2d Sess. 166 (1970) (statement of Andrew Gibson, Maritime Administrator) [hereinafter cited as *House Hearings II;* unless otherwise noted, all references to these House Hearings are to the statements of Administrator Gibson].

5. *See* H.R.Rep. at 38 (the Act will "enable American operators of bulk carriers to compete on a parity basis, costwise, with foreign carriers"); Merchant Marine Act § 601(a)(4), 46 U.S.C. § 1171(a)(4) (ODS to be awarded only if necessary "to place the proposed operations of the vessel or vessels on a parity with those of foreign competitors").

6. Foreign preference cargos are the only cargos at issue in this case; therefore, references in the text to "preference cargos" are to foreign preference cargos. Domestic cargos (cargos carried between two U.S. ports) are also preference cargos and are reserved exclusively to U.S. ships. 46 U.S.C. § 883. All domestic cargos, however, move at premium rates—CDS-subsidized ships cannot carry these cargos. Merchant Marine Act § 506, 46 U.S.C. § 1156; *see Independent U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 911–12 (D.C.Cir.1982).

7. *See* H.R.Rep. at 38:

Another factor prompting the Administration to extend operating subsidy to U.S.-flag bulk carriers is the desire to phase out premium rates .... The aim ... is to enable American bulk carriers, eventually at least, to carry government cargos at world rates.

*See also President's Maritime Program, Part 1: Hearings Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries*, 91st Cong., 1st Sess. 20 (1969) (statement of Andrew Gibson, Maritime Administrator):

The Department of Agriculture has spent $630 million over world market rates during the past 10 years for the transportation of [preference] cargo .... A system of direct subsidization of these ships, instead of the premium rate system, will result in savings totaling $480 million by 1982. In addition to these savings, modern productive bulk carriers will have been constructed.

8. In 1981, administration of the Merchant Marine Act was transferred from the Department of Commerce to the Department of Transportation. Maritime Act of 1981, Pub.L. No. 97–31, 95 Stat. 151. For convenience, we will refer to the current code.

9. *House Hearings II, supra* note 4, at 201; *see id.* at 640 (5-year phase-in "is what we have contemplated and it may have to be longer, but certainly 5 years").

and other dry bulk cargos.[10] These ships, built with CDS, were delivered between 1974 and 1976; each holds a 20-year ODS contract with the Maritime Subsidy Board. Under the operating subsidy contracts, the Subsidy Board reimburses Aeron for the excess of Aeron's cost for wages, insurance, maintenance, and repair over the cost of the same items to a foreign-flag carrier. Other operating costs are not subsidized because Congress did not expect them to differ significantly for U.S. and foreign vessels. Importantly, fuel costs are not subsidized.

However, subsequent events undermined Congress' expectation that ODS would make U.S. vessels competitive with foreign vessels. Until recently, U.S. ships, including the Aeron vessels, were built with steam engines, while foreign ships were powered by diesel engines. Diesel engines are more fuel-efficient but require more frequent repairs. In 1972, when Aeron contracted for its vessels, steam engines made economic sense because U.S. repair costs were higher than foreign repair costs and the lower repair costs more than offset the extra fuel expense.[11] Since the 1973–1974 escalation in fuel prices, however, steam-powered vessels have become much more expensive to operate than diesel-powered vessels. As a result, ODS falls short of making the Aeron vessels fully competitive with foreign vessels.[12]

The ODS contracts initially barred the Aeron vessels from carrying foreign preference cargos. In July 1976, the Board amended the contracts to permit the Aeron ships to carry foreign preference cargos at world rates when those cargos would otherwise have been carried by foreign ships.[13]

In August 1977, the Board again amended the ODS contracts to permit the vessels to carry certain liquid bulk preference cargos at premium rates but without receiving ODS.[14] In April 1978, Aeron requested permission from the Board to carry dry bulk cargos in lots of 55,000 tons or more under a similar arrangement (premium rates less any ODS received).

## C. Administrative Proceedings

Intervenor American Maritime Association, representing owners of "unsubsidized" premium-rate ships, opposed Aeron's request to carry dry bulk preference cargos and requested a hearing under § 605(c), 46 U.S.C. § 1175(c), claiming that existing service was adequate and that new entry would cause its members substantial competitive harm. After holding the § 605(c) hearing, the Subsidy Board issued an opinion concluding that "U.S.-flag services in the bulk preference trades . . ., including the applicants' . . . bulk vessels, is and will be inadequate" and that "operation of [the proposed] additional vessels . . . in the bulk preference trades would further the accomplishment of the purposes and policy of the Act within the meaning of Section 605(c)." *Atlas Marine Co.,* MSB No. S–605, 18 Ship. Reg.Rep. (P & F) 987, 1012 (1978) ("*Section 605(c) Opinion* "). It deferred for later consideration issues "related to the provisions of the Act other than Section[ ] 605(c)," including "which elements of cost ought to be included in the calculation of fair and reasonable rates for subsidized operators." *Id.* at 1011.

The Subsidy Board addressed the remaining issues in a Tentative Opinion and Order,

---

**10.** Ownership of the seven vessels is divided among six commonly controlled corporations and partnerships, all of which are co-plaintiffs. We use "Aeron" to refer collectively to all six entities.

**11.** Aeron Brief at 13; Affidavit of William Bullock, Chief, Division of Engineering, Maritime Administration ¶ 6 (Dec. 27, 1979), Record item 19.

**12.** Under § 603(b), 46 U.S.C. § 1173(b), the Subsidy Board "may" pay bulk cargo ships, "in lieu of the [usual ODS payment for wages,

insurance, maintenance, and repair], such sums as . . . [are] necessary to make the cost of operating such vessel competitive with the cost of operating similar vessels under the registry of a foreign country." The Subsidy Board has not, however, used this discretionary power to pay ODS for fuel costs.

**13.** Atlas Marine Co., MSB No. S–605, 18 Ship. Reg.Rep. (P & F) 987, 990 n. 7 (1978).

**14.** *Id.* at 990.

*Aeron Marine Shipping Co.,* MSB No. A–132, 19 Ship.Reg.Rep. (P & F) 111 (Mar. 16, 1979) (*"Tentative Opinion"*), solicited and received comments from all interested parties, and then issued a Final Opinion and Order that, with minor exceptions, adopted the Tentative Opinion and Order. *Aeron Marine Shipping Co.,* MSB No. A–132, 19 Ship.Reg.Rep. (P & F) 491 (June 14, 1979) (*"Final Opinion"*). The Final Opinion and Order permitted only two of the seven Aeron vessels to carry dry bulk preference cargos. *Id.* at 498–99. The stated purpose for excluding five vessels was "to minimize competition impact on the[ ] unsubsidized carriers." *Tentative Opinion,* 19 Ship.Reg. Rep. at 130. The Board did not explain why the question of competitive harm had not been subsumed in its prior determinations under § 605(c) that present service was inadequate and that entry by all seven Aeron ships would further the purposes and policy of the Act.

The Final Opinion and Order also established a "fair and reasonable rate" for the Aeron vessels equal to "world market rates, as calculated by the Maritime Administration . . . plus an allowance on the outbound leg for fuel consumption differential . . . , provided that when the world market rates rise above the vessel's break-even point . . . such fuel differential will be abated or eliminated." *Final Opinion,* 19 Ship.Reg.Rep. at 499.[15]

The Board's reasons for issuing this rate order are not entirely clear, but seem to include (1) reliance on Congress' intent "to phase out premium rates for preference cargoes," *Tentative Opinion,* 19 Ship.Reg.Rep. at 121; (2) the Board's belief that only carriage at or near world rates would satisfy § 601(a)(1), 46 U.S.C. § 1171(a)(1), which permits ODS to be awarded only if "the operation of such vessel . . . is required to meet foreign-flag competition," *see Tentative Opinion,* 19 Ship.Reg.Rep. at 127–28; (3) the profits from a higher rate would go primarily to the foreign company that holds long-term time charters on the two admitted Aeron vessels, *see id.* at 123; and (4) a round-trip fuel adjustment was not needed because "backhaul movements [in non-preference trades] of the [Aeron ships] may reasonably be contemplated," *Final Opinion,* 19 Ship.Reg.Rep. at 495.

## D. *The Proceedings Below*

Aeron, after exhausting administrative remedies, appealed the Subsidy Board's order to the district court. With regard to the Board's exclusion of five ships, Aeron claimed that the Board, after determining under § 605(c) for all seven ships that existing service in the bulk preference trades was inadequate and that new entry by all seven ships would further the purposes and policy of the Act, could not thereafter admit only two ships.[16] With regard to the Board's rate decision, Aeron argued that the Board has no authority to set rates; only the government agency that ships a preference cargo can do so.[17] It argued further that even if the Board has rate-setting authority, the rate that the Board selected (world rate plus one-way fuel allowance) was not "fair and reasonable" because it would require Aeron's ships to operate at a loss.[18] Finally, Aeron argued that because the selected rate would as a practical matter preclude its ships from carrying preference cargos, it was inconsistent with Congress' intent that preference cargos should be carried by subsidized ships rather than the less efficient unsubsidized ships that now carry these cargos.[19]

The Subsidy Board replied that it had discretion to determine how to phase in

---

**15.** The Board recognized that world market rates were currently "not sufficient for the applicant to break-even on the outbound [leg] without fuel differential"; thus the abatement provision would have no immediate effect. *Final Opinion,* 19 Ship.Reg.Rep. at 496.

**16.** Aeron Brief at 14. The methodology used by the Subsidy Board in finding inadequate

service is not at issue here, and we express no view on whether it was correct.

**17.** *Id.* at 18–33.

**18.** *Id.* at 34–41.

**19.** *Id.* at 41–43.

subsidized ships to the preference trades and that admitting only two ships was within that discretion.[20] With regard to rates, the Board asserted that it had rate-setting authority under § 603(a), 46 U.S.C. § 1173(a), which permits the agency to award ODS "subject to such reasonable terms and conditions . . . as the Secretary of Transportation shall require."[21] The Board defended its decision to award only a one-way rate adjustment on the ground that Aeron had made a business decision to use steam engines rather than more fuel-efficient diesel engines. It was reasonable, the Board argued, to set a rate under which Aeron would bear some of the consequences of that decision.[22]

The district court held that the Maritime Subsidy Board, having found that all seven ships were needed to serve the foreign preference trades adequately, had "no power to bar subsidized vessels from the preference trades." 525 F.Supp. at 540. The district court further held that the Subsidy Board had rate-setting authority under § 603(a), see 525 F.Supp. at 542–44, and that the world plus one-way fuel rate it had set for the entering ships was reasonable, see id. at 546–47. Aeron appeals the district court's decision on rate-setting authority and the reasonableness of the rate, and defendant-intervenor American Maritime Association cross-appeals the decision to admit all seven ships. The government noted, but later withdrew, a cross-appeal on the admission order.

## II. The Decision to Exclude Five Ships

### A. Standard of Review

■ Both the Subsidy Board's decision to admit only two ships and its rate decision were informal rulemaking under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551(4), 553. Thus, the district court correctly limited its review to whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." Id. § 706(2)(A), see 525 F.Supp. at 533–35. The question on appeal is whether the district court properly applied the APA's "arbitrary and capricious" formula. Sea-Land Service, Inc. v. Kreps, 566 F.2d 763, 773 (D.C.Cir.1977). This task, and thus the deference due to the agency, is not altered by the government's failure to appeal the adverse decision of the district court with regard to the admission order.

### B. The Subsidy Board's Exclusion Decision

We agree with the district court that the Subsidy Board must admit all seven ships to the preference trades. Our rationale for this result, however, differs somewhat from that of the district court.

■ The district court held that as a procedural matter, the Subsidy Board should have considered fully in the § 605(c) hearing whether the "purposes and policy" of the Act favored entry of all seven ships. Therefore, the Board erred in considering the purposes and policy of the Act partly in its § 605(c) decision and partly in its later decision on issues related to other provisions of the Act. We agree, for the reasons stated in the district court's opinion. See 525 F.Supp. at 538. We agree also that this procedural error was harmless and that the core question is whether, taking its three opinions as a whole, the Board has adequately justified its conclusion that the purposes and policy of the Act are best served by excluding five of the seven ships. See id. However, the district court framed the substantive question before it as whether the Subsidy Board, after finding inadequate service, "had the authority to bar five of plaintiffs' seven vessels." Id. (emphasis added). We, in contrast, think it clear that the Board has such authority. The statutory requirement that the Board consider both adequacy of service and whether new entry would further the purposes and policy

---

**20.** Defendants' Memorandum in Support of Motion for Summary Judgment at 20–22.

**21.** Government's Brief at 21–27.

**22.** Memorandum of Points and Authorities in Opposition to Plaintiff's Cross-Motion for Summary Judgment at 14–15.

of the Act carries with it the power to find that existing service is inadequate and nevertheless also conclude that new entry is undesirable. In our view, the proper question is not whether the Board has the authority to bar entry by five of Aeron's ships but rather whether the Board has exercised its authority in an arbitrary and capricious manner.[23]

We believe that the Board's action was arbitrary and capricious. Section 605(c) is a legislative attempt to protect existing U.S.-flag carriers from the competitive harm that would result from excess capacity. *Section 605(c) Opinion,* 18 Ship.Reg.Rep. at 998; *Sea-Land Service, Inc. v. Kreps,* 566 F.2d 763, 774 (D.C.Cir.1977). The basic statutory mechanism for protecting existing carriers is the administrative determination whether existing service is "inadequate." *See American President Lines, Ltd., Modification of Description Covering Subsidized Atlantic/Straits Service,* 1 Mar.Ad. 143, 172 (Subsidy Bd. 1963) (concluding after review of the legislative history that "the primary purpose of [§ 605(c)] was to protect against overtonnaging, and ... adequacy of service was to be the standard utilized") (footnote omitted).

The Subsidy Board must also make an independent inquiry into whether the purposes and policy of the Act favor additional entry. *Sea-Land Service,* 566 F.2d at 773 n. 50, 775–78. But § 605(c)'s basic criterion for new entry is whether existing service is inadequate. If present service is inadequate, then the purposes and policy of the Act will usually favor new entry. Indeed, since the Act does not define "inadequate" service, the Board will have already looked "to the *purposes* underlying [§ 605(c)] and the Act in general in order to delineate the contours of this critical term." *Id.* at 773 (emphasis in original) (footnote omitted). As the Board's review of the legislative history led it to conclude, the "purposes and

policy" language was added to the Act for this very purpose—"to 'relate back' adequacy to the goal contained in the Declaration of Policy Section." *American President Lines,* 1 Mar.Ad. at 173 (footnote omitted). Congress' intent "was not ... to broaden the scope of the [§ 605(c)] hearing ... but was rather [to] clarify[] the standard to be used in ascertaining adequacy of the service already provided by vessels of U.S. registry." *Id.*

■ There may be exceptional cases where the adequacy determination will not control the "purposes and policy" determination. As the Board noted, "[t]he principal issues relevant under purposes and policy are whether the [new] vessels would reduce the inadequacy of U.S.-flag service ... and whether that carriage would have a substantial adverse impact on existing unsubsidized carriers." *Section 605(c) Opinion,* 18 Ship.Reg.Rep. at 1008. It may be that due to the nature of the existing and newly entering ships, the new entrants will displace only U.S. and not foreign ships, so that new entry will not cure the existing inadequacy. *See American Export Lines, Inc.,* MSB No. S–288, 14 Ship.Reg.Rep. (P & F) 1539, 1549 (1975) (§ 605(c) applicant has "not shown in any manner that its proposed service would cure existing inadequacy"). Perhaps, too, competitive harm may be focused on one competitor, currently on the brink of bankruptcy. Other special cases may also arise. But as a general rule, when new entry will reduce present inadequacy of service, when harm to competitors is no more than would be expected from any new entry, and when no other special factors are present, the purposes and policy of the Act must favor new entry. In the Subsidy Board's own language,

[a] showing [under the purposes and policy clause] of probable or possible impact upon existing service must not deter the Board in ascertaining whether the exist-

---

**23.** In light of this approach, and our belief that our interpretation of § 605(c) is consistent with the Board's interpretation as expressed in *American President Lines, Ltd., Modification of Description Covering Subsidized Atlantic/Straits Service,* 1 Mar.Ad. 143 (Subsidy Bd.

1963), *cited in Section 605(c) Opinion,* 18 Ship.Reg.Rep. at 994 n. 15, 998 n. 23, we have no occasion to pass on the district court's view that the agency's construction of § 605(c) should receive only limited deference. *See* 525 F.Supp. at 536.

ing service meets the required adequacy *demanded by the goals of our national policy.*

*American President Lines,* 1 Mar.Ad. at 161 (emphasis added).

■ In this case, the Board decided to exclude five of the Aeron ships "to minimize competition impact on the[ ] unsubsidized carriers." *Tentative Opinion,* 19 Ship.Reg.Rep. at 130. But it adduced no evidence of unusually severe competitive harm. Quite the contrary, it expressly found that competitive harm would be "minimal" because the Aeron ships would carry only lots of at least 55,000 tons, and almost no cargos of that size were currently carried in U.S. ships. *Section 605(c) Opinion,* 18 Ship.Reg.Rep. at 1008–09. And it further noted that "it is difficult ... to weight very heavily any adverse competing impact" because "[t]he affected unsubsidized carriers have deliberately chosen to remain unsubsidized, apparently with the hope of continuing in the premium rate market as long as possible." *Tentative Opinion,* 19 Ship.Reg.Rep. at 130–31. In light of these findings by the Board, we hold that the Board's decision to admit only two of the Aeron vessels is arbitrary and capricious action in violation of the APA, 5 U.S.C. § 706(2)(A).[24]

### III. THE RATE DECISION

Turning to the question of rates, we find that the Maritime Subsidy Board has rate-setting authority under § 603(a), 46 U.S.C. § 1173(a). We conclude, however, that the Board has not adequately justified its rate decision and must, on remand, reconsider the proper rate.

### A. Authority to Set Rates

■ Section 603(a), 46 U.S.C. § 1173(a), provides that the Subsidy Board

may enter into a contract with the applicant for the payment of [ODS] ... subject to such reasonable terms and conditions, consistent with this [Act], as the Secretary of Transportation shall require to effectuate the purposes and policy of this [Act].

The Subsidy Board found that it had authority under this section to condition Aeron's receipt of ODS for dry bulk preference cargos on carriage of these cargos at a Board-selected rate. *Final Opinion,* 19 Ship.Reg.Rep. at 493. We agree.[25]

Courts generally give " 'great deference to the interpretation given the statute by the officers or agency charged with its administration.' " *EPA v. National Crushed Stone Association,* 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980) (footnote omitted) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)); *see National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 166 (D.C.Cir.1982). Where, as here, Congress has specifically conferred broad discretion on the agency with regard to a specific statutory provision, the agency's interpretation must be accepted unless "manifestly unreasonable." *National Wildlife Federation,* 693 F.2d at 174. Here we find nothing in the statute or

**24.** The district court, after ordering the Subsidy Board to admit all seven ships, remanded to the Board to determine whether to admit the seven ships unconditionally or whether to establish a priority system under which unsubsidized ships would have "the initial opportunity to carry preference trade." 525 F.Supp. at 540. It doubted, however, "whether the [Subsidy Board] can justify even a priority system to protect unsubsidized carriers" because Congress' purpose in protecting unsubsidized carriers "was to ensure that these carriers could depreciate fully investments made [before 1970]," and that purpose had probably already been accomplished. *Id.* at 541. Aeron does not appeal from the remand order. Aeron Brief at 15 n. 8. Since the issue is not before us, we

express no view on whether the district court was correct to doubt that the Board can justify a priority system. The district court's remand order, of course, remains in force.

**25.** The Subsidy Board also relied on § 601(a), 46 U.S.C. § 1171(a), which establishes various conditions for the award of ODS, as an alternate source of rate-setting authority. *Final Opinion,* 19 Ship.Reg.Rep. at 493. The district court agreed. 525 F.Supp. at 543–44. Since we find that § 603(a) authorizes the Subsidy Board to set rates as a condition for receipt of ODS, we do not reach the question whether § 601(a) provides an alternate source of authority.

the legislative history to suggest that the Subsidy Board's authority to condition receipt of ODS on "reasonable terms and conditions" does not permit it to set rates. Moreover, there is some support in the legislative history, discussed in the district court's opinion, for the proposition that the Subsidy Board can set rates. *See* 525 F.Supp. at 542 n. 33, 543. In sum, the Board's belief that § 603(a) authorizes it to set rates is eminently reasonable.

Aeron admits that § 603(a), on its face, permits the Board to set rates. It relies, however, on § 901(b)(1), 46 U.S.C. § 1241(b)(1), for the proposition that in fact only the agency actually shipping a preference cargo can set rates. Section 901(b)(1) instructs such agencies to

> take such steps as may be necessary and practicable to assure that at least 50 per centum of [foreign preference cargos] shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels.

Aeron argues that the specific reference to rate-setting in § 901(b)(1) must prevail over the general reference in § 603(a) to the Subsidy Board's power to set "reasonable

terms and conditions" for the award of ODS.

■■ The canon of statutory construction on which Aeron relies, however, applies only when there is an "inescapable conflict" between the specific provision and the general provision. C. Sands, *Statutes and Statutory Construction* § 46.05 (4th ed. 1972). Here, we see no conflict so long as the Board's authority to set rates for ODS-subsidized ships under § 603(a) is limited to rates that are "fair and reasonable . . . for United States-flag commercial vessels" within the meaning of § 901(b)(1).[26] The Board interpreted the statute in this manner and attempted to set such a rate. *See Tentative Opinion,* 19 Ship.Reg.Rep. at 121 (footnote omitted):

> The Cargo Preference Act of 1954 [codified as Merchant Marine Act § 901] provides a preference of certain government impelled cargo to U.S.-flag vessels so long as they are available at fair and reasonable rates. . . . At this time we consider the appropriate fair and reasonable rate for the Aeron vessels in the bulk preference trade . . . .

As detailed in the next section, the Subsidy Board may have failed in its endeavor to set a fair and reasonable rate for U.S.-flag

---

**26.** The legislative history of § 901(b) makes it highly improbable that Congress intended that section to preclude the Maritime Subsidy Board from setting rates under § 603(a). During oversight hearings on the Cargo Preference Act of 1954, the House Committee on Merchant Marine and Fisheries expressly noted the need for the Maritime Administrator to "publish rates for the guidance of the agency arranging cargo shipments in determining . . . whether United States-flag ships are available at fair and reasonable rates for United States-flag commercial vessels." *Administration of Cargo Preference Act,* H.R.Rep. No. 80, 84th Cong., 1st Sess. 21 (1955). The Committee explained:

> There can be little doubt as to the desirability of established freight rates . . . . Such rates should be set by an agency having available to it all the cost information it is possible to obtain . . . . [T]he proper agency *to do this work is the Maritime Administration.*

*Id.* at 18. The Maritime Administrator has in fact issued rate guidelines from time to time. *See, e.g.,* 29 Fed.Reg. 1665 (1964); 32 Fed.Reg. 15,769 (1967); 33 Fed.Reg. 4835 (1968).

Furthermore, Congress amended § 901(b) in 1970 to give the Maritime Administration the power to issue not just rate guidelines but also binding rate orders. Section 901(b)(2), added in 1970, instructs any agency "having responsibility under this subsection [to] administer its programs with respect to this subsection under regulations issued by the Secretary of Transportation." The Senate Report explains that the purpose of the amendment was

> to correct some of the inequities which have resulted from lack of uniformity in administration, and to facilitate the achievement of the program's objectives *with respect to substituting direct subsidies for the current system of premium rates.*

S.Rep. No. 1080, 91st Cong., 2d Sess. 58–59 (1970) (emphasis added). The Maritime Administration has not exercised its authority to issue rate orders under § 901(b)(2). But it would surely elevate form over substance to conclude that § 901(b)(1) bars the Subsidy Board from exercising similar rate-making authority under § 603(a).

commercial vessels. But § 901(b)(1) is no bar to the Board's *authority* to set such a rate.

## B. *The Reasonableness of the Rate*

Aeron contends that the rate selected by the Board—world rates plus one-way fuel adjustment—is unreasonable because it requires Aeron to operate at a loss and as a practical matter will preclude Aeron from bidding on preference cargos.[27] We find flaws in the Board's analysis that prevent us from finding that the rate is reasonable and require a remand to the Board to reconsider both the rate and its rationale.

Our review of the Board's rate decision is limited in scope. We must accept the agency's policy choices so long as they conform to "certain minimal standards of rationality." *Ethyl Corp. v. EPA,* 541 F.2d 1, 36 (D.C.Cir.) (en banc) (footnote omitted), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). However, we must also engage in a "searching and careful" review of the record. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *see Ethyl Corp.,* 541 F.2d at 35. For its decision to be sustained, "the agency must consider all of the relevant factors and demonstrate a reasonable connection between the facts on the record and the resulting policy choice." *Sierra Club v. Costle,* 657 F.2d 298, 323 (D.C.Cir.1981) (footnote omitted). In addition, the reasons relied on by the agency must " 'not deviate from or ignore the ascertainable legislative intent.' " *Ethyl Corp.,* 541 F.2d at 36 (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)).

In this case, the Subsidy Board has made key assumptions without supporting evidence and has also, in one regard, misconstrued its statutory mandate.

### 1. *Assumptions Made Without Supporting Evidence*

The Subsidy Board made three important assumptions for which we cannot find support in the record. First, the Board assumed that after carrying preference cargos from the U.S. to other countries, the Aeron vessels would be able to obtain backhaul cargos. Second, it assumed that the "world plus one-way fuel" rate was high enough in relative terms to make preference cargos attractive to Aeron in light of other opportunities for employment of the Aeron vessels. Third, it assumed that the selected rate was high enough in absolute terms to permit Aeron to earn a reasonable profit over the long term.

#### a. *Availability of Backhaul Cargos*

Premium rates for unsubsidized ships are calculated based on a round trip voyage. The Subsidy Board, however, awarded Aeron a fuel adjustment on the outbound leg only. It explained:

> [Subsidized] vessels were built with the specific objective of trading in the [general] foreign commerce of the United States.... [These] vessels are able to engage in U.S. import trades as well as foreign-to-foreign trades, all with the benefit of subsidy under a long term contract; whereas, the only viable employment for an unsubsidized vessel is the U.S. domestic trades or another cargo preference voyage. Therefore, backhaul movements of the [Aeron vessels] may reasonably be contemplated.

*Final Opinion,* 19 Ship.Reg.Rep. at 495. In other words, the Board assumed that because subsidized vessels were intended to be competitive with foreign vessels, they would be able to obtain backhauls in open competition with foreign vessels. However, the predicate does not justify the conclusion. First, backhauls may not be available on all trade routes. Second, it is undisputed

---

**27.** Aeron also argues that the rate is improper because it is a foreign-flag rate and § 901(b)(1) mandates fair and reasonable rates for "United States-flag commercial vessels." Aeron Brief at 33–34. We, however, see no reason why the Subsidy Board cannot set a fair and reasonable rate for U.S. ships by reference to world rates. We also see no reason why the Board cannot set rates for subsidized ships in a different manner than for unsubsidized ships; what is "fair and reasonable" may be different for subsidized than for unsubsidized ships.

that high fuel costs make the Aeron vessels not fully competitive with foreign vessels for backhaul cargos, despite Congress' expectation that ODS would make them competitive. The Subsidy Board recognized as much when it awarded a fuel adjustment on the outbound leg.

We do not know whether backhauls are available nor whether, despite their high fuel costs, the Aeron vessels are competitive *enough* to obtain backhaul cargos regularly. So far as we can tell from the record, neither did the Board when it issued its rate order. Yet, unless both conditions obtain, the Board's rationale for using a one-way fuel allowance rather than a round-trip allowance must fail.

A Maritime Administration staff study, performed subsequent to the Board's decision, indicates that the Aeron ships "can realistically expect to participate in the movement of [preference] cargo to only Egypt, Bangladesh and Pakistan."[28] It also notes that the world rate for outbound cargo is affected by the likelihood of backhaul; "[a] high frequency of backhaul cargos would influence lower rates on the outbound business."[29] On remand, if the Board still wishes to adopt a one-way fuel adjustment and to rely on its current rationale for doing so, it must consider (1) the actual availability of backhaul cargos from Egypt, Bangladesh, and Pakistan for ships of the Aeron vessels' size;[30] (2) whether

Aeron can in fact bid competitively for backhauls;[31] (3) the extent to which backhaul availability is already reflected in the world rate for the outbound cargo.

b. *Incentive to Enter the Preference Trades*

The Subsidy Board also assumed that the world plus one-way fuel rate was high enough relative to other rates to induce Aeron to carry preference cargos. Congress intended subsidized ships to take over the preference trades; "unsubsidized," premium-rate ships were to be phased out.[32] However, the Subsidy Board cannot compel subsidized ships to carry preference cargos; it must rely on market incentives to make carrying these cargos attractive. If the rate set by the Board is too low, subsidized ships will not carry preference cargos. Such a rate would frustrate congressional policy. Instead of saving money by having efficient subsidized ships carry preference cargos, the government would continue to pay premium rates to unsubsidized ships and would also incur the extra cost of paying ODS to subsidized ships to carry non-preference cargos.

We recognize that Congress also intended for subsidized ships to carry preference cargos at world rates. But this goal cannot be fully reconciled with the need to attract subsidized ships to the preference trades.[33]

---

**28.** Staff Review of Subsidized Vessel Participation in the Cargo Preference Trades 11 (1981), Joint Appendix ("J.A.") at 109, 120.

**29.** *Id.* at 30, J.A. at 139.

**30.** The Subsidy Board's assumption that backhauls are available appears to have been only partially correct. The staff study does not break down backhaul volume by size of backhaul lot. However, it suggests that there are some backhaul opportunities from Egypt and Pakistan, but only limited opportunities from Bangladesh. *Id.* at 31–32, J.A. at 140–41.

We do not, of course, suggest that this study is necessarily correct; that is for the Board to determine on remand.

**31.** One piece of evidence suggests that the Subsidy Board was incorrect in assuming that the Aeron vessels could bid competitively for backhauls. Six of the Aeron vessels have 15 or 20 year time charters; the seventh has only a

ten-year charter. The ship with a ten-year charter has applied to the Board to repay CDS when its charter expires and enter the domestic preference trade "since it sees no prospect for competitive employment in the foreign trade once its current time charter has terminated." *Id.* at 2, J.A. at 111.

**32.** *See* note 7 *supra* and accompanying text.

**33.** The legislative history suggests that the Maritime Administration, which sponsored the 1970 amendments, was aware that subsidized ships might be unwilling to carry preference cargos at world rates. Section 501(a), 46 U.S.C. § 1151(a), provides that CDS contracts "shall not restrict the lawful or proper use or operation of the vessel except to the extent expressly required by law." The Maritime Administration proposed deleting this clause so that it could require, as a condition to the award of CDS, that the vessel be employed in

Perhaps, were it not for the 1973–1974 jump in fuel prices, favorable "positioning"[34] would have made preference cargos attractive to the Aeron ships at least some of the time, even at world rates. But at existing fuel prices, the cargos most attractive to Aeron are those that minimize fuel costs: short hauls to ports with long turn-around times (*i.e.*, slow loading and unloading) so that the ship has a high ratio of port days to sea days.[35] Since the ports to which Aeron can carry preference cargo (Egypt, Pakistan, and Bangladesh) involve relatively long voyages, it is unlikely that preference cargos would be attractive at world rates.

Given the tension between Congress' dual objectives to have subsidized ships carry preference cargos and have subsidized ships carry those cargos at world rates, the Subsidy Board must strike a balance between the conflicting goals. It must seek to have subsidized ships carry preference cargos at rates that, so far as practicable, approach world rates. But it must also permit rates high enough to provide reasonable incentives for subsidized operators to carry those cargos.[36] The Subsidy Board did allow Aeron some increment above world rates, at least when world rates are below Aeron's breakeven point. But we do not know, and the Subsidy Board did not inquire, whether that increment will be sufficient to make preference cargos attractive compared to other commercial opportunities available to subsidized bulk ships such as Aeron's.[37]

the preference trades for some portion of its economic life. H.R. 15,424, § 5(1)(d) (as proposed, Jan. 28, 1970), *reprinted in House Hearings II, supra* note 4, at 84, 86. Maritime Administrator Gibson explained:

> One of the principal objectives of direct subsidization of bulk carriers is the reduction and eventual elimination of the premium rate system for certain preference cargoes. The ability to require that new bulk carrier tonnage be employed for some portion of its economic life in this preference trade is necessary to assure that premium rates are eventually eliminated.

*House Hearings II, supra* note 4, at 234. Congress, however, rejected this proposal without recognizing or reconciling the tension between its two objectives.

34. "Positioning" refers to the need for a ship to travel from its current location to the loading point for its next cargo. A short positioning distance makes the new cargo more attractive to the shipowner, other things being equal. *See* Staff Review, *supra* note 28, at 24, 30, J.A. at 133, 139.

35. At oral argument, counsel for Aeron explained that the Aeron ships were presently employed primarily in carrying crude oil from Venezuela to the United States. *See also* Staff Review, *supra* note 28, at 23, J.A. at 132 (Aeron vessels have been employed "in the carriage of bulk liquid products in worldwide trade particularly from the Mediterranean and the Caribbean to North America").

36. One of the factors that influenced the Subsidy Board's rate decision was its interpretation of § 601(a)(1), 46 U.S.C. § 1171(a)(1), which permits the Secretary of Transportation to approve an ODS contract only if "the operation of such vessel . . . is required to meet foreign-flag

competition." The Board had earlier interpreted this provision to require reduced ODS payments to subsidized *liner* vessels unless those vessels earn more than 50% of their revenue by carrying cargos at world rates or rates "directly influenced or determined" by world rates. *Fact-Finding Hearing Re: Payment of Subsidy for Carriage of Preference Cargoes,* 3 Mar.Ad. 268, 275 (Subsidy Bd.1972), *see* 46 C.F.R. § 280 (1981) (regulations implementing the Board's decision). We affirmed the Board's interpretation. *States Marine Int'l, Inc. v. Peterson,* 518 F.2d 1070, 1075–82 (D.C.Cir.1975), *cert. denied,* 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976). In the course of considering Aeron's application, the Board extended this interpretation to cover bulk vessels as well. *Tentative Opinion,* 19 Ship.Reg.Rep. at 125–28.

It may well be that a rate resulting from the balancing process outlined in the text would be a rate "directly influenced" by world rates. If so, there would be no bar to Aeron's receipt of full ODS even if Aeron's ships earn more than 50% of their revenue from preference cargos. We need not decide this issue since the Board considered it likely that the Aeron ships would "continue to operate substantially in the [non-preference trades]." *Id.* at 127.

37. Over time, as other subsidized ships seek to enter the preference trades, the Subsidy Board will have to decide whether to conduct this inquiry for each individual ship, for each class of ships, or for the group of subsidized ships as a whole. Our choice of phrasing in text—"subsidized bulk ships such as Aeron's"—merely reflects our *guess* that the Board will choose to determine the relative attractiveness of its chosen rate(s) for each class of ships. It should not be read to foreclose the Board from another course of action.

The Board simply assumed that Aeron would carry preference cargos.[38] On remand, the Board must consider what rate will be sufficient to induce subsidized ships such as Aeron's to carry preference cargos.[39]

### c. *Profitability Over Time*

In addition to arguing that the rate selected by the Board is unattractive *relative* to other commercial opportunities, Aeron argues that the selected rate is not "fair and reasonable" in an *absolute* sense because it would require Aeron to operate at a loss. The Subsidy Board responded by stating that although Aeron could not break even at present world rates, even with a one-way fuel allowance, world rates were cyclical and Aeron would earn a profit over the long run. It reasoned:

> Whether the rates the applicant will obtain with the fuel differential are "economic" . . . will depend on the world market rates. As applicants acknowledge, under certain conditions, the rate may be less than cost but over the long run must approximate costs. Therefore, over the course of the applicant's subsidy

agreement the rates with the fuel differential . . . will be "economic."

*Final Opinion,* 19 Ship.Reg.Rep. at 496.

We do not understand Aeron to make such a concession, and the point is not obvious. First, it is not clear what the Board meant by "economic." It may have meant merely covering costs without earning a profit, as suggested by its statement that the chosen rate "over the long run must approximate costs." If so, that is not standard usage; there must also be a return on invested capital.

Second, the Board could reasonably assume that over time, foreign ships operating at world rates will cover their costs and earn a reasonable profit. If Aeron received a round-trip fuel allowance, the same would be true for its ships, because Aeron's nonfuel costs net of subsidy are competitive with foreign costs. However, if Aeron receives only a one-way subsidy, it will probably over time *fail* to earn a reasonable profit. This is doubly true since even the one-way fuel adjustment will be abated if world rates rise above Aeron's breakeven point.[40] We do not know whether Aeron will even cover its costs; that will depend on whether it earns more on the outbound leg than it loses due to excess fuel costs on the inbound leg.[41]

**38.** *See, e.g., Tentative Opinion,* 19 Ship.Reg. Rep. at 130:

> The action herein will continue the program intended by Congress of replacing premium rates in the U.S. preference trades with world rates and direct subsidy at substantial savings to the government . . . . We estimate considerable savings as compared to the cost if these two vessels were operated at premium rates in the U.S. preference trades.

**39.** There is some evidence that the world plus one-way fuel rate may be too low to be attractive to Aeron. Since the Subsidy Board's Final Order, the two admitted Aeron vessels have bid on five preference cargos. Only once has Aeron accepted the government's counteroffer. For three of the four unsuccessful bids, Aeron's initial offer, although higher than the world plus one-way fuel rate permitted by the Board's rate order, was substantially lower than the successful bids of unsubsidized U.S. ships. Staff Review, *supra* note 28, at 23–28, J.A. at 132–37. Had Aeron and the government been able to agree on rates, the government would have saved several million dollars.

**40.** When Aeron objected to the abatement order, the Board declined to reconsider on the grounds that the matter was "academic at this time"; Aeron was "free to renew its request" at a later date. *Final Opinion,* 19 Ship.Reg. Rep. at 496. The Board cannot, however, use a long time frame to respond to Aeron's argument that the chosen rate is uneconomic, and then turn around and use a short time frame to respond to Aeron's complaint about losing the fuel adjustment should rates rise above breakeven. In considering the Board's argument that the chosen rate would be economic over the long run, we must assume that the abatement order will remain in place.

**41.** The district court noted that "Aeron fails to demonstrate that world rates plus a fuel consumption differential outbound will not produce a reasonable profit whether or not there is any empty backhaul." 525 F.Supp. at 547 (footnote omitted). The proper question, however, is whether there is any basis for the agency's belief that Aeron will make money, not whether Aeron has proved that it will not.

The Board may have treated inbound losses as irrelevant on the theory that it was sufficient for Aeron, over time, to cover its costs or make a reasonable profit on the outbound leg. But even outbound, Aeron will probably not earn a reasonable profit because the fuel adjustment will be abated when world rates rise above Aeron's breakeven point. More important, Aeron must calculate its costs on a round-trip basis; an outbound profit followed by an inbound loss will be unattractive.[42]

On remand, the Board must consider whether the rate it selects will permit Aeron to (1) cover its costs without a return on capital or (2) to earn a reasonable profit. If Aeron will not earn a reasonable profit, the Board must explain why the rate is nonetheless "fair and reasonable" in light of the discussion below of the legal meaning of that phrase.

### 2. Misconstruing Its Statutory Mandate

The Subsidy Board also appears to have misconstrued its statutory mandate in one significant respect. One factor in its rate decision was that the profit from higher rates would accrue to the foreign charterers of the two admitted Aeron vessels. See Tentative Opinion, 19 Ship.Reg.Rep. at 123. The statute, however, distinguishes only between U.S.-flag and foreign-flag ships. Section 901(b)(1), 46 U.S.C. § 1241(b)(1), requires that 50% of foreign preference cargos "shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels. (Emphasis added.)[43] Nothing suggests that a lower rate is "fair and reasonable" for a

U.S. ship chartered to a foreign company than for a U.S. ship not so chartered. Therefore, the Board should not have considered this factor.

### 3. The District Court's Rationale

The Board, as noted above, assumed that the selected rate would be "economic." The government defended the rate decision, though, on a different ground, and the district court relied on that ground. In response to Aeron's contention that it would have to operate at a loss in the preference trades, and that only a rate permitting a reasonable profit was "fair and reasonable," the government argued that fair and reasonable rates need not take into account Aeron's mistaken business decision to build steam-powered ships.[44] The district court recognized that in the context of utility regulation, "administrative agencies engaging in rate regulation must set rates which allow a fair profit." 525 F.Supp. at 546 n. 38; see FPC v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). However, it agreed that Aeron was not entitled to a profitable rate, citing legislative history to the effect that a high-cost operator was not guaranteed a profit. 525 F.Supp. at 546; see Administration of Cargo Preference Act, H.R.Rep. No. 80, 84th Cong., 1st Sess. 18 (1955) (oversight report) (quoting the opinion of the Comptroller General):

> the term [fair and reasonable rates] "would appear to call for reasonable compensation to the operator, including a fair profit. . . . However, it seems apparent that the statute contemplates average 'fair and reasonable rates,' which may or may not be profitable, or even compensatory, to a high-cost operator."

---

**42.** The Subsidy Board implicitly recognized as much by discussing the availability of backhaul cargos. See notes 28–31 supra and accompanying text. Fair and reasonable rates for unsubsidized ships, of course, are calculated on a round-trip basis. See Final Opinion, 19 Ship. Reg.Rep. at 495.

**43.** See also, e.g., § 603(b), 46 U.S.C. § 1173(b) (ODS shall equal the excess of the wage, insurance, maintenance, and repair costs "incurred in the operation under United States registry of the vessel or vessels covered by the contract,

over the estimated fair and reasonable cost of the same items . . . if such vessel or vessels were operated under the registry of a foreign country"). The Board saw nothing remiss in awarding ODS to the Aeron vessels even though they were under long-term time charter to foreign operators.

**44.** Memorandum of Points and Authorities in Opposition to Plaintiff's Cross-Motion for Summary Judgment at 14–15.

This post-hoc rationalization for unprofitability cannot, of course, cure the Subsidy Board's improper assumption that the world plus one-way fuel rate *would* be profitable in the long run. Nevertheless, since the question may arise on remand, we consider briefly whether a fair and reasonable rate must provide a reasonable profit.

We cannot agree that the high fuel costs of the Aeron ships would justify the Board's decision to set an unprofitable rate. The statutory standard is "fair and reasonable rates for *United States-flag commercial vessels.*" Merchant Marine Act § 901(b)(1), 46 U.S.C. § 1241(b)(1) (emphasis added). The record shows that the Aeron ships are *more* efficient than most other U.S. bulk ships.[45] It is beside the point that their high fuel costs make the Aeron ships high-cost carriers relative to foreign ships.

On the other hand, we agree with the district court that utility rate cases requiring a reasonable profit are not controlling. In particular, because Aeron can continue to operate its ships in the nonpreference trades, an unprofitable rate for preference cargo would not raise any fifth amendment concerns. Thus, the question is purely one of statutory construction: What did Congress intend (or if it had no specific intent, what would it have wanted) the term "fair and reasonable rates for United States-flag commercial vessels" to mean as applied to subsidized bulk ships?

We do not decide that question today. On remand, the Subsidy Board should consider whether the rate it selects will allow Aeron to earn a reasonable profit. If not, it should explain why the language and legislative history of the Merchant Marine Act justify the chosen rate. Only then will we be in a position to review the Board's interpretation, with appropriate deference to the agency's construction, to determine if it is " 'sufficiently reasonable' to be accepted by a reviewing court." *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981) (quoting *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975)).

## IV. CONCLUSION

It was arbitrary and capricious for the Maritime Subsidy Board, after finding inadequate service in the bulk preference trades, to nonetheless admit only two of the seven Aeron ships. The Subsidy Board has authority under the Merchant Marine Act to set rates for the carriage of bulk preference cargos by subsidized ships, but has failed to adequately consider all relevant factors in making its rate determination. The decision of the district court is *affirmed* on admitting all Aeron ships and the Board's authority to set rates, and *reversed* on the reasonableness of the rate. The case is *remanded* to the district court to remand to the agency for further proceedings consistent with this opinion.[46]

45. *See* Staff Review, *supra* note 28, at 23–27, J.A. at 132–36; Aeron Brief at 37 n. 24 (both comparing rates offered by Aeron on preference cargos to rates paid to other U.S. ships); *see also Facing Reality at Sea,* Forbes, Nov. 8, 1982, at 42, 42 (majority of U.S. ships need replacing "because they are too small, too old . . ., or have fuel-guzzling steam turbine engines"). At some future point, as more fuel-efficient diesel ships enter the U.S. fleet, the Aeron ships may indeed become high-cost carriers relative to other U.S. ships. But it appears that we have not reached that point yet.

46. We note that Congress, in 1981, amended the Act to permit a subsidized operator to elect to suspend its ODS agreement for up to one year so long as the vessel is less than ten years old and the owner agrees to repay a pro rata share of construction subsidy. The operator would then presumably be eligible to bid on foreign and domestic preference cargos at premium rates. Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, sec. 1603, § 614(a), 95 Stat. 357, 751 (codified at 46 U.S.C. § 1184(a)). On remand, the Board is free to take this section into account if it is relevant. We, of course, express no view on that question.